## I. DALE SNODGRASS *v.* DONALD S. STUBBS, ET UX.

[No. 142, October Term, 1946.]

*Decided July 8, 1947.*

*Dissenting Opinion filed July 14, 1947.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Samuel K. Dennis* and *A. Frederick Taylor*, with whom was *Harry W. Allers* on the brief, for the appellant.

*Michael Paul Smith* and *Edward H. Burke,* with whom were *Smith & Barrett* and *Bowie, Burke & Leonard* on the brief, for the appellees.

COLLINS, J., delivered the opinion of the Court.

The appellant, I. Dale Snodgrass, filed a bill of complaint and a supplemental bill in the Circuit Court for Baltimore County on December 1, 1945, alleging in effect that Donald S. Stubbs and Mabel S. Stubbs, his wife, respondents below, appellees here, during the year 1938, had a contract to purchase from the University of Maryland a certain poultry plant and dairy farm containing 211 acres, more or less, in Baltimore County. During the year 1939, he alleged that he was in the employ of the appellees as manager of this farm and a mushroom business installed thereon. He says the appellees entered into an agreement with the appellant whereby, upon the contribution of $5000, for the purpose of the farm and mushroom operation, the appellees agreed to convey a one-third interest in the aforesaid farm and mushroom business to the appellant when the debts of the operation were fully paid. A copy of this alleged agreement was filed and will be set out later in this opinion. The appellant alleged that he had performed his obligations under the aforesaid agreement and paid the $5000 for the purpose of the farm operation.

He alleged that the loan made by the Reconstruction Finance Corporation to the appellees had been paid in full out of the income from the operation of the farm, mushroom business, and other businesses conducted thereon, and at the time of that payment all indebtedness due the appellees could have been paid from the partnership net earnings. He further stated that his operation of the farm and mushroom business had been entirely successful, and as a result the portion of the purchase price furnished by the appellees had been repaid them. He stated that all debts and expenses of operation had been paid and there remained to the credit of the business, at the date of the filing of the

complaint a bank balance of approximately $35,000, and other net earnings totaling an amount sufficient to meet the terms of the aforesaid agreement. He said that since the performance of his obligations under the agreement he had made numerous demands upon the appellees to convey a one-third interest in the farm and mushroom business to him, but that the appellees had refused to do so. He alleged that since the performance of his obligations, the farm, mushroom business, dairy business, canning business, and other operations on said farm have been conducted at a profit and that one-third of the net profits derived as aforesaid belong to him.

He prayed that the appellees be enjoined from disposing of the farm, mushroom business, its stock and equipment, and profits in bank, wherever they may be found. That the said agreement to convey a one-third interest in the said farm and mushroom business by the appellees to the appellant, as set forth in the agreement, be specifically enforced and that a trustee or trustees may be appointed to carry out this agreement. He also asked for other and further relief.

A demurrer to these bills was overruled. An answer was filed by the appellees, which in effect stated that the $5000 contributed by the appellant was a loan to them and they have repaid it with interest. They said that the appellant retired from the management of the aforesaid business and undertook a full time position with the Reconstruction Finance Corporation. They further said that the purchase price furnished by them had not been repaid. They denied that all debts and expenses of the operation had been paid. They also denied that there remained a bank balance to the credit of the business at the time of the filing of the bill of complaint of $35,000, but said that there were substantial obligations still due by the business. They denied that the appellant had performed his obligations under the agreement and stated that the appellant ceased to be manager of this business, and that they have been conducting it since

January 1, 1943, at a profit. They made other allegations in their answer.

After taking of extensive testimony, the Chancellor dismissed the bill of complaint by decree on the 19th day of November, 1946, and from that decree, the appellant appeals to this Court.

The testimony in this case shows that the appellant is a brother-in-law of Donald S. Stubbs and a brother of Mabel S. Stubbs and, prior to 1938, was employed as cashier of the Frostburg National Bank at a salary of $3000 per year. He knew nothing about farming or the mushroom business. The parties to this case were very friendly and visited each other on numerous occasions. The appellee, Donald S. Stubbs, at that time was engaged in various business enterprices, the principal one seems to have been that of buying manure from the government at Fort Myer, Virginia, and selling it to farmers. The appellees lived near Street, Harford County, Maryland. There is much dispute as to whether the appellant was urged by the appellees to give up his position at Frostburg and come with them or whether he did this on his own initiative. The fact remains that on September 1, 1938, the appellant resigned his position in Frostburg. The parties to this case conceived the idea of going in the mushroom business. Appellant obtained a position through the appellees on a mushroom farm at Rising Sun, Maryland. It is admitted by all parties that this was done so that he could learn the mushroom business.

In 1938, the appellees signed a contract with the University of Maryland to purchase a farm near Cockeysville consisting of 211 acres, more or less, highly improved and mechanized, for the price of $40,000. This farm had been given to the University of Maryland that same year by Mr. Charles E. McManus. The idea was conceived that as the mushroom business was seasonal and the source of manure was constant, that, if the appellees went into the mushroom business, it would develop an outlet for the manure during the normal slack

season. The appellees paid $5000 on account of the $40,000 purchase price and the appellant claims that at that time a verbal partnership agreement was entered into whereby the appellees and the appellant became partners, each to have a one-third share. The appellant claims that he was to manage the farm and enterprises carried on there and a one-third title to the farm was to be put in appellant's name when the appellees got back the cash they had invested in the farm.

Appellant claimed that this partnership was formed between the parties to this case in September, 1938, under the aforesaid verbal agreement, and from and after that date they were equal partners in this enterprise. This is denied by the appellees. Without reciting in detail all the evidence presented on each side, we agree with the Chancellor that this verbal partnership agreement, alleged to have been formed in 1938, was not established by the evidence.

Appellant moved into a house on the McManus farm in May, 1939. He received heat, light and telephone, all paid as farm expenses. He drew $35 per week from the enterprise until June or July, 1942.

The appellees, having paid $5000 on the purchase price and $10,000 in changing the buildings, $35,000 remained to be paid. None of the parties to this case had this amount of money. The appellees tried unsuccessfully to get $35,000 from a bank in Baltimore and from other sources. In 1939, they applied to the Federal Land Bank and to the Reconstruction Finance Corporation for a loan but were refused by both. The appellant, on account of his former connections with the Frostburg Bank and the Reconstruction Finance Corporation, went to Richmond, and largely through the appellant's efforts, the Reconstruction Finance Corporation agreed to lend $35,000 to the appellees to be secured by a mortgage on the farm, provided the appellant put $5,000 as additional capital in the venture. The representative of the Reconstruction Finance Corporation testified that this suggestion that Snodgrass put up $5,000 came from the

parties to this case and not from the Reconstruction Finance Corporation.

A resolution was passed by the Reconstruction Finance Corporation on September 20, 1939, authorizing the loan of $35,000 under certain conditions, one being that the appellant, Snodgrass, put $5,000 as working capital in the business, which he did. At that time the appellees had $15,000 in cash invested and the appellant had $5,000 in cash in the business. The appellant borrowed this $5,000 from a Mr. Ruegert with interest at three percent pen annum.

On October 6, 1939, an agreement was drawn by an attorney and signed under seal by the appellees and the appellant. The agreement was drawn by the attorney after conversations with Stubbs and representatives of the Reconstruction Finance Corporation. It was filed as exhibit No. 2 with the bill of complain. For the purposes of this case, it is necessary that this agreement be set out in full. It follows:

"This Agreement, Made this 6th day of October, 1939, by and between Donald S. Stubbs and Mabel S. Stubbs, his wife, co-partners, of Harford County, State of Maryland, parties of the first part, and I. Dale Snodgrass, of Baltimore County, State aforesaid, party of the second part.

"Whereas, the said parties of the first part have recently purchased from the University of Maryland all that certain farm, containing two hundred and eleven (211) acres, more or less, located in the Eighth Election District of Baltimore County, near Cockeysville, and are now operating the same as a mushroom plant and dairy farm, and

"Whereas, the said party of the second part is now employed by the said parties of the first part, as manager of the aforesaid farm, and is vitally interested in the successful operation thereof, and

"Whereas, the said parties of the first part have arranged to obtain a loan from the Reconstruction Finance Corporation in the amount of $35,000.00, for the pur-

pose of paying the balance due on the purchase price of said farm and buying additional machinery and equipment for the operation of the mushroom plant, and

"Whereas, in order to comply with the requirements of the resolution passed by the said Reconstruction Finance Corporation, under date of September 20th, 1939, the said I. Dale Snodgrass must furnish the sum of Five Thousand Dollars ($5,000.00), to be used as working capital for the operation of said dairy farm and mushroom business, which the said I. Dale Snodgrass has agreed to do without any obligation on the part of the parties hereto of the first part to repay the same.

"Now, therefore, this Agreement witnesseth that in consideration of the premises and the sum of $1.00, the said party of the second part does hereby covenant and agree that as long as any part of the loan from the said Reconstruction Finance Corporation remains outstanding, he, the said party of the second part, will not claim or be entitled to any return on the aforesaid sum of Five Thousand Dollars ($5,000.00) contributed for the purpose hereinafter set forth, and the said parties of the first part do hereby covenant and agree that after the aforesaid loan from the Reconstruction Finance Corporation has been fully paid out of the income from the operation of said dairy farm and mushroom business and after that portion of the purchase price already furnished by the parties of the first part, together with all other debts incurred in connection with the operation of said farm, they, the said parties of the first part, will then convey to the said party of the second part a one-third interest in the aforesaid farm and the mushroom business operated thereon."

This agreement, if enforceable, was an agreement to deed a one-third interest at a later date, not a partnership agreement.

On April 20, 1940, the appellees executed the mortgage in the amount of $35,000 to the Reconstruction Finance Corporation and the farm was purchased from the University of Maryland in the names of the appellees.

From the testimony, it is plain that both the appellant, Snodgrass, and his wife, worked hard in this enterprise. He put in long hours in manual labor and his wife helped him to the best of her ability, at times even cleaning the toilets. He also acted as bookkeeper for the business, approved payrolls, signed the checks, and, as stated by the Chancellor, if he was not in complete charge, he was certainly in joint charge of this farm, which was then called "Mushroom City." He had at that time a drawing account of $35 a week, which at times he overdrew. He also continued to live in a house on the farm and received his heat, electricity, and telephone service without charge. He and his mother at various times borrowed money and loaned it to the business. These loans were all repaid.

During this period from 1939 to 1942, the business operated at a loss. With the beginning of the war, the cost of labor was high due to war plants in the vicinity, and mushroom farming was not classified as essential by the governmental authorities. In June, 1942, the appellant received an offer of a position in the Baltimore office of the Reconstruction Finance Corporation at a salary of $3,000 per year. He consulted with the appellees as to whether he should accept this position. It appears from the testimony that neither of the appellees objected to the appellant accepting this employment. The appellant was informed that the Reconstruction Finance Corporation would not object if he worked after its business hours in the mushroom enterprise. Mr. Graham, of the Reconstruction Finance Corporation, testified that Mr. Stubbs told him that he had no objection to the appellant accepting the employment and asked whether there was any objection to appellant working at "Mushroom City" after hours. The appellant accepted the position. His $35 per week drawing account from the mushroom business ceased, and he continued to live in the house on the farm. Before he went to work in the morning he would line up the work for the day, and get the men started. In the evening after he came home

he would do other work around the farm and do the bookkeeping. He did such work as repairing oil burners, boilers, and lights. Mrs. Stubbs kept the books up until January 1, 1940, and after January 1, 1945. Appellant kept the books during the years 1940, 1941, 1942, 1943, and 1944. At times he would be called at his office in Baltimore concerning problems at the farm. During this period a tomato cannery was put in and the appellant helped to do part of the work in installing the canning machinery, and worked in the cannery sometimes at night. He spent his summer vacations working on the farm.

The Chancellor found that when the appellant accepted this position with the Reconstruction Finance Corporation and ceased to devote all his time to the mushroom business, he surrendered and abandoned his rights under the agreement of October 6, 1939. With this finding of the Chancellor, we do not agree.

One of the appellees, Mrs. Stubbs, admitted that the appellant consulted her and her husband about accepting the position with the Reconstruction Finance Corporation and both she and her husband said it would be all right for him to take it. They did not tell the appellant that by accepting that position, he was breaking the agreement of October 6, 1939, and they did not say at any time that he was breaking the agreement by that act. She said that they agreed to appellant accepting this position. She said that appellant agreed that all his salary there, over $35.00 per week, was to have been paid back to the farming operation. Appellant denies this. She said that this was not repaid. She admitted that she and her husband permitted the appellant to work in the mushroom business before he went to his office in the morning and after he came home at night. She admitted that the appellant's wife continued to do the same work after 1942, as before. Donald Stubbs, the other appellee, admitted when the appellant went with the Reconstruction Finance Corporation that he did not

object and did not tell the appellant that he had no more rights under the agreement. He admitted that the appellant was at the farm every morning and night except at times when it was necessary for him to go to other cities. Stubbs spent much time in Florida. He admitted that he had a canning business in Florida and while there would often call up the appellant and write him about the business at Cockeysville. Without reciting all the voluminous testimony on the question, this Court specifically finds, that by accepting employment with the Reconstruction Finance Corporation, the appellant did not surrender any rights which he had under the agreement of October 6, 1939, and that up until June or July, 1945, he was actively engaged during part of his time in all the work, including the mushroom business, the canning business, and the dairy business, conducted on the farm known as "Mushroom City." There is no doubt that the appellant did less work at "Mushroom City" after 1942, than before. There is also no doubt that the appellees did more work there after, than before 1942.

In 1943 and 1944, a substantial foundation for the business was established, due, no doubt, to the foundation laid by the appellant before 1943. During 1940 three hundred thousand pounds of mushrooms were sold. In 1945, vegetables were bought and raised for canning in the cannery at "Mushroom City" and additional land was rented. The labor problem was substantially solved. Mushrooms were sold at good prices. The profits from canning increased and the business became very successful.

In March, 1945, the mortgage of the Reconstruction Finance Corporation was paid and in April, 1945, the balance of $5,000.00 contributed by the appellant as "working capital" was repaid to him. The mushroom business also paid the interest on this loan from Mr. Ruegert. Early in 1945 Mrs. Stubbs, while in Florida, wrote a letter to her husband in Cockeysville which contained this statement: "Now is the time to get rid of

others and be in business with ourselves." In June of that year the appellant says that he asked Mr. Stubbs "about getting my name on the deed." He says that various objections were offered by Stubbs. The appellees had met an accountant, a Mr. Klein, in Florida and he came up to "Mushroom City" in June, 1945, to work on the books. He finished his work in July, 1945. The appellees then called the appellant in, and Mr. Klein explained the statement which he made as of June 30, 1945, which appellant claimed showed a net profit of $67,000 for the first six months of 1945. Mrs. Stubbs says that the appellant then asked "What about my one-third interest?" Mrs. Stubbs, when asked the question what she said to appellant when he presented the contract and claimed he was a partner with a one-third interest and wanted a deed, answered, "I said what I have always said to him, that we have not been paid back, that you are two years too soon." Mr. Stubbs also said the time was premature. The appellant then claims that the appellees stated that he had no interest in the business. Apparently appellant's work at "Mushroom City" ceased about this time, as Mrs. Stubbs demanded that he give up the books. Appellant claims that Stubbs told him to keep away as he was "causing a disruption."

Appellant states that during subsequent conversations with the appellees and their attorneys as to settlement of his rights in this business, he was offered $25,000 in full settlement by the appellees. This was not denied by Stubbs, who says that the only reason he made this offer was because it was a family affair.

Appellant continued to live in the house. On December 1, 1945, he filed his bill of complaint in this case. This Court, being of opinion that the agreement of October 6, 1939, for what it was worth, was in effect when the appellant's active operation in the business ceased in July, 1945, must decide what are his rights under that contract.

It has been many times stated by this Court that a contract to be specifically enforced must be definite,

clear, and certain in all of its terms. The terms of the agreement must be clearly and fully shown so that the Court can have no difficulty in knowing those terms, so as to carry into effect the contract made by the parties. Ordering specific performance of a contract, the terms of which are not clear, would be making a contract for the parties, which the Courts have no authority to do. *Trotter v. Lewis,* 185 Md. 528, 45 A. 2d 329; *Bank v. Hurst's Estate,* 187 Md. 333, 50 A. 2d 133; *Doering v. Fields,* 187 Md. 484, 50 A. 2d 553; *Gibbs v. Meredith,* 187 Md. 566, 51 A. 2d 77; *Garbis v. Weistock,* 187 Md. 549, 51 A. 2d 154; *Smith v. Biddle,* 188 Md. 315, 52 A. 2d 473.

The Chancellor found that the agreement left in considerable doubt the source from which the required payments were to be made before the appellant's right to a one-third interest in the property matured. He concluded because other businesses were conducted on the farm subsequent to 1942, when appellant accepted the position with the Reconstruction Finance Corporation, that any income from businesses started after that date should not be included in any financial statement affecting the rights of the appellant. As hereinbefore stated, this Court is of opinion that the appellant contributed largely to the operation of the business after 1942, and that he is entitled to share in all operations at "Mushroom City" up until June 30, 1945, including the cannery and machinery businesses. As the agreement states that the payments were to be made from the operation of said dairy farm and mushroom business, the testimony produced at the hearing shows that the other operations were incidental and part of the farm operations in which the appellant took an active part. We interpret the agreement to mean income from all sources of profit based on the farm known as "Mushroom City" and we believe that the testimony and the conduct of the parties fairly sustain that construction.

The appellees further contend, and the Chancellor found, that the financial condition of "Mushroom City"

in July, 1945, when the appellant ceased his work there, was not such that there could be paid out of that business "that portion of the purchase price already furnished by the parties of the first part, together with all other debts incurred in connection with the operation of said farm," as called for by the agreement, and which was a condition precedent to the deeding of the one-third interest to the appellant. The books of the corporation, kept mostly by the appellant and partly by other persons, were not in such condition to make that fact easily ascertainable. A number of accountants examined the books with the idea of determining the financial condition, including an accountant, William J. Seward, originally employed to set up the books by all the parties to this suit in 1940, called by the appellant, and Mr. Klein, hereinbefore mentioned, employed by the appellees.

The Chancellor, in order to get a clear financial picture of the situation, appointed Mr. Charles W. Amos, a Certified Public Accountant, of twenty-five years experience. The Chancellor stated that this appointment was made "with the agreement of all parties, to make an examination of the books and records of the businesses involved in this litigation, and other businesses which may be related to it, to determine whether or not one of the elements of the partnership which is here asserted, has been yet complied with, that is the agreement alleged, requiring the repayment to Mr. Stubbs of his capital investment and all the outstanding indebtedness of that business." Mr. Amos spent eight hours a day for thirty days on the audit in this case and made his report to the Court. He was paid a fee of $1,500 by the parties to this suit equally. This statement is in detail and apparently covers every feature of the business here in question. From our examination of this report it appears to be as fair a summary of the financial condition of the business in question as could be made. Exhibit B contains the following statement of the condition of the business as of June 30, 1945, made by Mr. Amos:

44

## Assets

| | |
|---|---|
| Cash | $25,149.69 |
| Accounts receivable Customers | 7,279.24 |
| Accounts receivable Employees | 384.36 |
| Inventories | 4,600.00 |
| Trust fund | 1.00 |
| Land | 10,000.00 |
| Buildings | 50,697.13 |
| Machinery and equipment | 26,761.54 |
| Furniture and fixtures | 42.00 |
| Live stock | 1,445.00 |
| Total Assets | $126,359.96 |

## Liabilities

| | |
|---|---|
| Accounts payable | $3,105.55 |
| Due to employees | 1,289.25 |
| Accrued Social Security Tax | 5.58 |
| Withholding Tax | 25.30 |
| Total Miscellaneous Liabilities | $4,425.68 |
| Reserve for Depreciation | $14,294.51 |
| I. Dale Snodgrass | 1,000.00 |
| Write up of assets | 19,295.00 |
| Donald S. Stubbs | 16,217.90 |
| Net Profit | 71,126.87 |
| Total Liabilities and Capital | $126,359.96 |

In making this statement Mr. Amos took into consideration the statements made by Mr. Klein and Mr. Seward. We think that the $1,000 credited to the appellant, as balance owing on the $5,000 loan, was repaid to him, although he claims that this $1,000 payment was a bonus. Therefore, this sum of $1,000 should be taken from the appellant and added to the net profits, making that

figure $72,126.87. From this statement it is plain that the mortgage to the Reconstruction Finance Corporation has been fully paid. The other debts, excluding the $1,000 shown as owing to I. Dale Snodgrass, which we will not allow, are total miscellaneous liabilities, $4,425.68, and the amount due Donald S. Stubbs, $16,217.90, making the total debts due, before the agreement of October 6, 1939, is enforceable, the sum of $20,643.58. The cash on hand was $25,149.69, which was ample to pay the debt of $20,643.58. Therefore, according to this statement, the financial condition of the business on June 30, 1945, shows that the loan of the Reconstruction Finance Corporation had been fully paid and there was ample cash to pay the amount owing to Donald S. Stubbs and all other bills incurred in connection with the operation of said farm as required by the agreement of October 6, 1939.

The appellees object to this statement for several reasons. 1 and 2. Because the statement does not include a sum which appellees claim is a fair and reasonable charge for the use, by "Mushroom City," and repairs of the trucks and tractor equipment, belonging to other enterprises of the appellees for the period from 1938 to 1945. We do not think that this is a fair charge as nothing was said about this item until the trial of the case and these charges do not appear on the books. Labor was exchanged between "Mushroom City" and other enterprises of the appellees and we do not see why "Mushroom City" should be charged for truck hire, as the trucks belonged to the appellees, who were also the owners of "Mushroom City." 3. Appellees also claim interest on their investment in the enterprise. It is true that interest was paid to Mr. Ruegert by the business on the the $5,000 borrowed from him by the appellant and put in the business. This interest was paid with the consent of the appellees, but we feel that it should be refunded to the enterprise. In the final accounting, therefore, the appellant will be charged all interest paid to Mr. Ruegert on this sum of $5,000. According to the

testimony in the case the interest rate was three (3%) percent per annum. There is no provision in the agreement of October 6, 1939, that interest should be paid on the investment and we conclude that Mr. Amos was correct in disallowing this item. 4. The appellees claim that they should be allowed compensation for their services. There is no provision in the agreement of October 6, 1939, about compensation for the appellees and these charges do not appear on the books. This amount was properly disallowed. Appellant was paid a salary up until 1942 with the express consent and agreement of the appellees. Appellees also claim that their income tax liability should be taken into consideration. The income tax liability is a personal matter and paid by the individuals and not by the business. That item was properly disallowed. An objection is also raised that the report of Mr. Amos includes an inventory of the cattle and crops. Mr. Amos stated that the figures in the inventory of the farm, cattle, crops, and subsidies were largely obtained from Mrs. Stubbs, one of the appellees. Mr. Amos was asked the question: "To what extent was there disagreement by Mr. and Mrs. Stubbs on the figures—not on the method with which you dealt with the figures, but on the figures themselves in this report?" He answered: "I may be wrong, but the only time that Mr. Stubbs, the only item that he really objected to was the growing mushrooms as of November 30, 1945." Under the agreement the appellant would certainly be entitled to an interest in these inventories when and if that agreement became enforceable. The value placed on the inventories would not affect the question as to whether there was sufficient cash to pay all obligations, and therefore whether the agreement of October 6, 1939, was enforceable. We therefore can find no error in the statement made by Mr. Amos as of June 30, 1945, except the item of $1,000 allowed the appellant.

In order for a contract to be specifically enforced, it must be mutual, which means an obligation on each party to do or permit to be done something in consideration

of the act or promise of the other. *Miller's Equity Procedure,* section 685, page 791; *Spear v. Orendorf,* 26 Md. 37, 43; *Canton Co. v. Baltimore & O. R. Co.,* 79 Md. 424, 429, 29 A. 821.

It is true that the contract is silent as to any obligation or undertaking by the appellant, other than the contribution of $5,000 to be used as "working capital." This contribution was made by the appellant and was repaid to him with interest. Certainly the intent of the parties must have been that the appellant had obligations other than the contribution of the sum of $5,000 as aforesaid. The only statement as to any other duties on the part of the appellant is the paragraph:

Whereas, the said party of the second part is now employed by the said parties of the first part, as manager of the aforesaid farm, and is vitally interested in the successful operation thereof, * * *."

The appellant acted as manager and gave full time to the business up until the summer of 1942. The testimony shows, as hereinbefore set forth, that the appellant accepted the position with the Reconstruction Finance Corporation with the full consent and approval of the appellees. Appellees could at that time have elected to rescind the contract. They did not do so. They cannot accept the benefits of appellant's services and then rescind their contract and deprive him of his benefits under that contract. *Cole v. Hines,* 81 Md. 476, 479, 32 A. 196, 32 L. R. A. 455; *Carmine v. Bowen,* 104 Md. 198, 204, 64 A. 932, 9 Ann. Cas. 1135; *Eareckson v. Rogers,* 112 Md. 160, 169, 75 A. 513; *Read Drug & Chemical Co. v. Nattans,* 130 Md. 465, 100 A. 736. They accepted his services after that date and those of his wife and reaped the benefits of their services. At no time was he told that he was violating the agreement of October 6, 1939. We must therefore assume that the services rendered by him were such as not to violate that agreement. He continued to work in this business until such time as he considered that he was due his one-third interest, which we find he was entitled to at that time.

When he demanded this interest, it was denied him on the grounds that the financial condition was such that all obligations could not be paid. He then ceased work.

It is true that where a contract on one side calls for personal services, the performance of such services could not be compelled by a specific performance suit instituted by the other party to the contract and the contract is therefore not mutual. *Reed v. Reed,* 165 Md. 604, 169 A. 798. However, in the instant case we find that the appellant has performed the services called for under the agreement. His part of the contract has been executed and it is executory only on the part of the appellees. In the case of *Reed & Fibre Products Corp. v. Rosenthal,* 153 Md. 501, 138 A. 665, Rosenthal filed a suit for specific performance of a contract whereby he was to perform personal services on one side and the corporation on the other side was to issue him stock. It was said in that case, 153 Md. at pages 518 and 519, 138 A. at page 672: "It is further objected that specific performance should be denied because of lack of mutuality. This contention is answered by this court, speaking through Judge Parke, in the recent case of *Liggett Co. v. Rose,* [152 Md. 146, 136 A. 651], wherein it is said: 'While mutuality should exist from the beginning of the contract, there is a distinction drawn by the authorities between the mutuality of right and obligation and the mutuality of the equitable remedy; since the first is the binding efficacy of the agreement upon both the parties, and since the second concerns the right of both the parties to obtain a specific performance. "If the first does not exist when the parties have gone through the form of concluding their contract, it can hardly be said that any agreement at all has been made; any subsequent act, omission or event which would create a mutuality of obligation, would virtually be the making of a new agreement. The mutuality of the equitable remedy, on the other hand, does not belong to the essence of the contract. An agreement may be perfect in its obligations upon both parties, and yet be of such a nature that one

of them only could be compelled, by a decree of the court, to specifically perform. As the absence of this kind of mutuality does not render the agreement any less obligatory, it would seem on principle, that if the quality originally lacking, should be subsequently supplied, in any practical manner, before the commencement of the suit, or event, perhaps, before the hearing, the objection would then be removed and a specific performance would be thus made possible." *Pomeroy's Specific Performance* (3d Ed.), sec. 166, pp. 429, 430, sections 171-173; *French v. Boston Nat. Bank,* 179 Mass. 404, 60 N. E. 793.' See, also, *Hendler Creamery Co. v. Lillich,* [152] (Md.) 190, 136 A. 631; [60 A. L. R. 207]; *Maryland Construction Co. v. Kuper,* 90 Md. 529, 45 A. 197." See also *Weaver v. King,* 184 Md. 283, 40 A. 2d 511; *Mannix v. Baumgardner,* 184 Md. 600, 42 A. 2d 124.

In the case now before this Court, under the agreement and the testimony there was a mutuality of right or obligation. It is true that personal services were required according to the testimony. As we find that those services were rendered, that objection is removed and specific performance is therefore made possible. We are therefore of opinion that specific performance should be granted.

Ordinarily an agreement to enter into a partnership at will, will not be specifically enforced on account of its voluntary nature. It was said by this Court in the case of *Maxa v. Jones,* 148 Md. 459, at page 464, 129 A. 652, 654: "We have not overlooked the fact that the voluntary nature of the partnership relation has also long deterred the courts from forcing parties to a partnership agreement to go forward with it themselves (*Gusdorff v. Schleisner,* 85 Md. 360, 374, 37 A. 170), and has always prevented such enforcement when the parties were free to dissolve the partnership at any time. *Burdick on Partnership* (3d Ed.) 13, 14. *Story on Partnership,* sec. 189. And we have not overlooked the fact that under section 31 (2) of the Uniform Partnership Act (Code, art. 73-A), the law of this state now is that dissolution is caused, 'in

contravention of the agreement between the partners * * * by the express will of any partner at any time'." However, specific performance has been decreed to secure to a partner his interest in property to which, by the agreeement, he is entitled. In the case of *Elliott v. Jones,* 11 Del. Ch. 283, 101 A. 872, the parties entered into a partnership agreement as to a race horse. The Court there held that the defendant might be required specifically to perform the conveying·to plaintiff of an undivided one-half interest in the horse, although continuance of the partnership could not be decreed. This case was based on the legal principle that while a court of equity will not decree specific performance of an agreement to form a partnership, because being at will it is terminable by either party immediately, it will secure to a partner his interest in property to which, by the partnership agreement, he is entitled. The authority relied on was the case of *Somerby v. Buntin,* 118 Mass. 279, 287, 19 Am. Rep. 459. In that Massachusetts case an oral agreement was made between the parties that the letters patent on an invention should be the joint properties of three persons, each owner to have a one-third part thereof. A bill was filed in equity, asking among other things, that the defendant be compelled to assign and transfer to each of the plaintiffs a one-third part of said letters patent and of the invention. The Court held in that case that specific performance might be exercised over agreements for the transfer of interest in personal property or patent rights. It further held that although a court of equity will not ordinarily decree specific performance of an agreement to form a partnership, which may be immediately dissolved by either party, the court will secure to a partner the interest in property to which, by the partnership agreement, he is entitled.

Likewise, in the instant case we cannot enforce the specific performance of that part of the agreement which calls for a conveyance of a one-third interest in the business. However, we can secure to the appellant his

interest in the property to which, by the agreement, he is entitled.

The case will therefore be remanded for the appointment of a trustee. If the miscellaneous liabilities in the amount of $4,425.68 in the Amos statement of June 30, 1945, have not been paid, the trustee shall pay from said business said liabilities. If Donald S. Stubbs has not been paid the sum of $16,217.90, as shown in the Amos statement of June 30, 1945, he shall be paid that amount. The trustee shall then convey to the appellant, I Dale Snodgrass, a one-third interest in the farm known in these proceedings as "Mushroom City," purchased by the appellees from the University of Maryland, and also convey to the appellant a one-third interest in all the inventories, stock, and equipment on said farm as of June 30, 1945, including the mushroom inventory and equipment, the cannery inventory and equipment, the machinery inventory and equipment, and a one-third interest in all other stock and equipment on this farm on June 30, 1945. If, on account of a disposition of personal property since June 30, 1945, it is not possible for the trustee to convey to the appellant a one-third interest therein, the appellees shall account to the appellant for the value thereof. The appellant shall refund to the business the interest paid by it on the $5,000 note to Mr. Ruegert.

> *Decree reversed and case remanded for the passage of a decree in conformity with this opinion, costs in this Court and below to be paid by the appellees.*

MARKELL, J., delivered the following dissenting opinion:

1. To be specifically enforced, a contract must be fair, certain and mutual (*Miller, Equity*, secs. 681, 683, 685) and must be of a class which courts deem susceptible of specific performance (sec. 668), *e. g.*, ordinarily not a contract involving personal services, such as contracts of employment or partnership, or especially executory

contracts for the formation of a partnership. *Maxa v. Jones,* 148 Md. 459, 462-464, 129 A. 652. When contracts for personal services have been fully performed, payment may be compelled by specific performance (*Mannix v. Baumgardner,* 184 Md. 600, 42 A. 2d 124), but in cases of partial performance specific performance will not be granted (*Fitzpatrick v. Michael,* 177 Md. 248, 9 A. 2d 639), though other relief may be, in rare cases by injunction and more frequently by pecuniary compensation. *McKeever v. Washington Heights Realty Corporation,* 183 Md. 216, 223, 37 A. 2d 305.

Ordinarily it is sufficient that contracts be fair when made, but "it would seem from many decisions, both ancient and modern, that their enforcement may be interfered with and prevented by *subsequent unforeseen events,* which introduce a sufficient element of inequality, unfairness or hardship." *Pomeroy, Specific Performance,* 3d Ed., sec. 178; *cf. Maryland Telephone & Telegraph Co. v. Chas. Simons Sons Co.,* 103 Md. 136, 63 A. 314, 115 Am. St. Rep. 346. This proposition has the support of Story, but (as Pomeroy says) is not universally admitted. If a contract is changed, manifestly it must be fair when originally made and when the changes are made.

In the instant case the contract never was performed as written. Frequent departures from the written contract and changes in circumstances not only create uncertainty as to the terms of the contract, but if plaintiff's contentions are accepted, have the effect of giving plaintiff more and more for less and less. In the circumstances any kind of specific performance would do serious injustice to defendants, and would not be warranted by the terms of the contract, with alleged changes.

2. The contract as written was wholly lacking in mutuality. It imposed no obligation on plaintiff to continue in defendants' employment. It recites that plaintiff "is *now* employed" by defendants, "as manager of the * * * farm, and is vitally interested in the successful operation thereof," that defendants have arranged to obtain a loan of $35,000 from the R.F.C., and in order

to comply with the requirements of the R.F.C., plaintiff must furnish $5,000, "to be used as *working capital* for the operation of said dairy farm and mushroom business," which he has agreed to do "without any obligation on the part of the parties hereto to repay the same." (Italics supplied.) The contract provides that so long as any part of the R.F.C. loan is outstanding, plaintiff "will not claim or be entitled to any return on the * * * $5,000" and after the R.F.C. loan "has been fully paid out of the income from the operation of said dairy farm and mushroom business and after that portion of the purchase price already furnished by" defendants, "together with all other debts incurred in connection with the operation of said farm," [has been so paid] defendants "will *then* convey" to plaintiff "a one-third interest in the aforesaid farm and the mushroom business operated thereon." (Italics supplied.) It is not disputed that "all other debts incurred in connection with the operation of said farm" include all additional investments by defendants for fixed or working capital.

The contract was a highly speculative "shoestring" contract on both sides. Plaintiff got employment, a house and a salary. He furnished $5,000 as "working capital," in return for which he got a *future* contingent right to receive a one-third interest in "the farm and the mushroom business." Defendants got no house or salary, furnished $10,000 (or $15,000) capital, and mortgaged all their assets in this and other business to secure the $35,000 loan from the R.F.C.

Judge Murray suggests that the element of mutuality was supplied by oral testimony that plaintiff should continue in defendants' employment (for no definite period), though the oral testimony was contradictory as to the nature of the employment, plaintiff making the untenable claim of an *existing* partnership. If we accept Judge Murray's suggestion and also the contentions (which he rejected) (a) that plaintiff did not break his contract in 1942 by taking "full-time" employment with the R.F.C., and (b) that plaintiff's contingent interest ex-

panded (as his labor shrank) to include the new canning and machinery business, still it does not follow that defendants were obligated (*i*) to continue indefinitely to expand their labor, investment and risk, and plaintiff's contingent interest, and (*ii*) also to accelerate the contingency by taking out of the business capital which could only be momentarily withdrawn, thus leaving the business without working capital (which it was the initial purpose of plaintiff's contract to provide) and putting it in debt (which it was an ultimate purpose of the contract to extinguish). When plaintiff went with the R.F.C. the business was losing money and his withdrawal gave him a larger salary, and saved defendants his salary but gave them more work. When by defendants' efforts the business had prospered, but their investment had *not* been repaid out of earnings, and he demanded conveyance of an interest in the property and business, he did not offer to return from the R.F.C. and do his original full share of work.

Though the contract provided that plaintiff should receive "no return" on the $5,000 till the R.F.C. loan was repaid and no repayment of the $5,000 at all, in fact interest was paid from the beginning, and the $5,000 itself was repaid early in 1945. For six months before the bill was filed, and a year before the supplemental bill, plaintiff had nothing invested in the business, was rendering no services, and was occupying the house and paying no rent. The supplemental bill was filed for the sole purpose of claiming an interest in earnings (as well as enhanced value of the property) for a later period after plaintiff's complete severance from conduct of the business. It seems impossible that this can be the true construction of the parties' contractual relations or that (if it is) such a contract would be specifically enforced by a court of equity.

3.  Aside from the uncertainty as to the terms of the contract and the unfairness of the contract as construed by plaintiff, his demand for conveyance of a one-third interest in the property and business was premature.

The time for such conveyance had not arrived—and never did arrive before relations between the parties were severed. Before plaintiff was to be entitled to such conveyance, defendants' investment was to be repaid out of earnings, *i. e.*, (*i*) the investment must be earned and (*ii*) repaid. If it was repaid out of capital, *e. g.*, out of depreciation allowances or sale of capital assets, but was *not* earned, the contingency had not occurred. Likewise, if the earnings exceeded defendant's investment, but the earnings (like the original capital) were invested in the expanded business and could not be withdrawn without liquidating the business or promptly replacing them or borrowing elsewhere, again the contingency had not occurred. In this there is no particular hardship to plaintiff (if that were material and would justify us in remaking the contract). While plaintiff was a full-time employee of defendants, the business was a losing venture. To keep it alive and to change an unprofitable to a profitable business, defendants were required to increase their investment to the extent of both past losses and also the needs of new businesses.

Plaintiff and defendants severed relations about the middle of 1945. The business was conducted in seasonal cycles, "from seedtime to harvest" and the like. Accounted for on a receipt basis (which was the actual method of accounting used by plaintiff as bookkeeper), the first six months of a calendar year produced profits (if any), the last six months' losses, just as a retail business might produce profits in December and losses the rest of the year. The record contains no balance sheet or earnings statement *from the books* as of June 30, 1945. The only such statements are those of Mr. Amos, who entirely rewrote the books, on an accrual basis, with various changes in plaintiff's book-keeping. His rewriting made material changes in earnings or surplus (an increase of $56,808.20 as of December 31, 1945), but presumably little change in cash. As of June 30, 1945 he shows $25,149.69 cash and $16,217.90 as defendants' investment. As of August 31, 1945 he shows $7,181.65

cash and $26,832.24 investment; as of December 31, 1945, $2,281.12 cash and $32,589.32 investment. Nevertheless "net profit" (as computed by Amos) was $72,126.87 as of June 30, 1945, $70,062.11 as of August 31, 1945 and $90,667.54 as of December 31, 1945. The fluctuation in cash was evidently a normal seasonal fluctuation. Defendants could not reasonably or prudently have withdrawn their $16,217.90 in order to accelerate plaintiff's contingent right (if any). If they had done so, they would have been short of cash by over $9,000 (plus additional investment of $10,000) at August 31, 1945, and by about $14,000 (plus $16,000) at December 31, 1945.

Whether plaintiff's book-keeping was strictly correct or not, there is no warrant for Amos rewriting the books so as to increase book profits by $56,000 at December 31, 1945 (probably a substantially smaller difference at June 30, 1945, as the difference between receipts and accruals would be less at that period). Either the receipt basis or the accrual basis of accounting is proper, for general purposes or for tax purposes. Except for tax purposes, the accrual basis is almost unknown in judicial accounting, e. g., in estate accounting in the Orphans' Courts or in equity courts. Whether the method used was adopted as the conservative course of not counting your chickens before they are hatched, or to avoid or evade taxes, it was evidently satisfactory to plaintiff and defendants and became a part of their contract. Amos seems to admit that growing crops and unpaid government subsidies are commonly not entered on books of account until realized in cash, and that for tax purposes farmers may use the cash method, without inventorying at all.

It may be that part of the $56,000 difference consists of inadvertent errors by plaintiff—or of errors by defendants after severance of relations with plaintiff. Any such errors (obviously the latter) should be corrected, but additional evidence would be necessary for that purpose. The treatment of depreciation and "profits on sale of equipment" must have been deliberate and should

not be changed for plaintiff's benefit.

Furthermore, if the court undertook to rewrite the books, there would be plausible grounds for making some allowances, as Judge Murray did, to defendants, *e. g.,* for interest, salaries (especially after plaintiff went with the R.F.C.) and perhaps income tax.

4. The most that plaintiff might be entitled to is compensation for partial performance, *not* by conveyance of any interest in the *property or business* but by payment to the extent of his inchoate interest in one-third of the net earnings up to severance of relations, say June 30, 1945. The record does not show directly the correct amount of such earnings. As computed from the books by Klein, the amount of profits to December 31, 1945 is $32,394.65. The last six months of 1945 apparently showed a loss (on the same basis) of $19,991.31, indicating profits of $52,385.96 to June 30, 1945. As computed by Amos from his rewritten books, the amount to June 30, 1945 is $72,126.87. The proper allowance (if any) to plaintiff would seem to be between $10,000 and $25,000, as nearly as the record shows, about $17,000. Any conveyance of an interest in the property or business would amount to specific performance of an *executory* agreement to form a partnership which was dissolved before it ever came into being. A sale of the property and business would be necessary to carry out the decree. The decree would bring the partnership into being only to put an end to it.

Judge DELAPLAINE authorizes me to say that he concurs in this opinion.