STAMATIADES et al. *v.* MERIT MUSIC SERVICE, INC.

[No. 179, October Term, 1955.]

600

Decided July 27, 1956.

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*William W. Cahill, Jr.,* with whom were *Weinberg & Green* on the brief, for the appellants.

*Henry R. Wolfe* for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court of Baltimore City, enjoining the defendants, appellants here, from placing, or permitting any person or persons other than the plaintiff, appellee here, Merit Music Service, Inc., to place or locate any coin-operated amusement, music or vending machines in the premises in which the defendants conduct a restaurant or similar business until September 17, 1959.

The plaintiff (sometimes referred to below as "Music Service") owns and leases coin-operated equipment, such as the machines covered by the injunction, to the owners and operators of restaurants and other places patronized by the public. The defendants (sometimes referred to below as "Proprietors") operate a restaurant at the premises known as No. 219 W. Franklin Street, in Baltimore. In September, 1954, the Proprietors wished to enlarge their restaurant and for that purpose leased additional space in an adjoining building. They were in need of funds to make the alterations necessary for the enlargement and for other expenses in connection therewith. They had had coin-operated amusement devices on the original premises for some seven or eight years previously, which were furnished by someone other than Music Service.

On September 17, 1954, following various negotiations, Music Service lent the Proprietors $3,000 and on that day the parties [1] entered into a written leasing agreement. This agreement recited that "in consideration of a loan of Three (3) Thousand dollars no cents ($3,000) loaned by Operator [Music Service] to Proprietor[s], the parties hereto agree as follows:". Then followed six numbered paragraphs. By paragraph 1.a Music Service agreed to install in the main room of the Proprietors' premises three coin-operated devices, one of which was designated as a Console Amusement Ma-

---

1. Mrs. Stamatiades is not named as a party in the body of the agreement. The husband is named "individually and jointly trading as Superior Restaurant." Both husband and wife signed the agreement and both are parties to the suit.

chine, another as a Pinball Amusement Machine, and the third as a Coin-operated Music Box. Music Service also agreed by paragraph 1.b that upon written notification from the Proprietors that any of the equipment was not functioning in a normal manner, it would put such equipment in proper operating condition within a reasonable time thereafter.

The proprietors agreed, among other things, to keep the equipment in continuous operation during business hours during the term of the lease or any renewal thereof, not to install and operate on the premises, and not to permit any other party to do so, any electrical, manual or mechanical coin-operated equipment, machines or phonographs other than those furnished by Music Service; and they further agreed "by reason of the aforementioned consideration passing to him [them]" that a decree might be passed in a suit brought for such purpose enjoining them "from violating this covenant." The agreement also provided that the rental for the equipment should be 50% of all monies paid by the public for the use of the equipment, payable each and every week (with a somewhat different provision as to cigarette machines, none of which is involved in this case). By paragraph 4 of the agreement the Proprietors further agreed and guaranteed that Music Service's share of the revenues should be not less than $70 per week each and every week, and that if the proceeds to Music Service should fall below that amount Music Service should have the right to terminate the agreement. The leasing agreement was to be effective for a period of five years from its date, with provision for renewals for like periods thereafter, subject to the right of either party to terminate the lease by written notice given sixty days prior to the expiration of the first term or of any renewal term thereafter.

Paragraph 2 of the leasing agreement, upon which the appellants place their greatest reliance, reads in part as follows (the term "Operator" as therein used referring to Music Service and the term "Proprietor" referring to the defendants):

> "2. The Proprietor agrees:
> c. Should there be any necessity in the sole discretion of the Operator for the equipment

> to be replaced or for the number of machines to be decreased, the Proprietor agrees to permit the Operator to change or to decrease the number of machines, but at no time shall Operator increase machines without Proprietor's consent."

There was a dispute between the parties immediately prior to the execution of the agreement of September 17, 1954, as to whether or not the Proprietors were to receive what is spoken of as a "gratuity" of $1,000 from Music Service in connection with the installation of the latter's machines. Music Service refused to agree to any "gratuity" and the leasing agreement was executed on the basis of there being a loan of $3,000, not a loan of $2,000 and a gratuity of $1,000. The appellants also executed a chattel mortgage which the appellee has neither released nor recorded. It is not now in issue and the appellants have abandoned any further claim of a "gratuity".

A few weeks after the agreement of September 17th had been entered into, Mr. Silverberg, President of Music Service, found that his Company's machines had been disconnected and were no longer in use, and either then or thereafter machines furnished by the same competitor whose machines had previously been installed in the Proprietors' restaurant were again installed there. The Proprietors paid off the $3,000 loan at the bank from which Music Service had itself borrowed the money with which to make the loan to the Proprietors. This payment was made without the prior knowledge of Music Service. The Proprietors ordered Music Service's machines removed from the restaurant, and Music Service did remove them. After some negotiations between the parties failed this suit was instituted.

The appellants contend that the injunction which was issued was a negative form of specific performance, and they claim that it was improperly issued because of the lack of mutuality of remedy under the agreement, because there was an adequate remedy at law, and because of Music Service's power to terminate the agreement.

We shall take up first the appellants' contention with regard to the adequacy of the plaintiff's remedy at law and second the effect of its right to terminate the agreement if receipts were less than $70.00 a week.

The appellants' contention based upon the alleged adequacy of the appellee's remedy at law is answered by *Hendler Creamery Co. v. Lillich,* 152 Md. 190, 136 A. 631, in which an injunction was sought restraining the defendant from selling any ice cream products other than the plaintiff's. The Court said (at pp. 203-204 of 152 Md., pp. 635-636 of 136 A.):

> "The only remaining question is whether the contract, being valid, is enforceable in a court of equity. Of this we have no doubt. The damages which might be sought to be recovered in a court of law would be practically impossible of ascertainment, because of the difficulty of determining in advance the quantity of the commodities which will be used, and, further, the impossibility of determining in sums of money the damage which would result to the appellant by losing the advertisement of its own goods and having that of a competitor's substituted at the appellee's place of business."

An additional answer to this contention is that the appellants have neither shown their ability to respond in damages nor offered a bond with satisfactory sureties so to respond. Code (1951), Article 16, Section 101; *Foster-Porter Enterprises v. De Mare,* 198 Md. 20, 81 A. 2d 325.

Their contention that the existence of a right on the part of Music Service to terminate the agreement if receipts from its machines in the Proprietors' restaurant were less than $70 a week bars specific performance is also untenable. The appellants say that there was no allegation in the amended bill, nor was there any testimony at the trial, to the effect that Music Service's share of the receipts exceeded $70 per week. It would seem that the burden of establishing such a fact as to the period before the appellants' repudiation of the contract, if material at all, rested upon them, and they have not met it. As to the period after they disconnected Music Service's ma-

chines and ordered them removed, they can derive no benefit from their own repudiation of the agreement. The contract does not purport to give them the option either to perform or to pay damages. *Armstrong v. Stiffler,* 189 Md. 630, 56 A. 2d 808; *Linz v. Schuck,* 106 Md. 220, 67 A. 286. Indeed, the only liquidated damages clause in the agreement is applicable only in case of the sale or transfer of the Proprietors' business.

The appellants' violation of a material term of the contract, such as their refusal to keep the appellee's equipment in operation, gives the appellee a right of termination quite independent of any default provisions of the contract, but such a right of termination does not of itself bar the appellee's right to insist upon specific performance. See *Foster-Porter Enterprises v. De Mare, supra.* The appellee's additional right to terminate the agreement because of the inadequacy of receipts is a cumulative remedy, and the existence of such a remedy does not bar specific enforcement of the contract. *Armstrong v. Stiffler, supra.* See also, *Restatement, Contracts,* Sec. 376, and *Corbin, Contracts,* Vol. 5, Sec. 1202.

The appellants' principal contention is based upon the qualification of Clause 1.a of the agreement, under which Music Service agrees to furnish machines, by the provisions of Clause 2.c quoted above, under which Music Service has the right in case of any necessity, in the sole discretion of Music Service, to change or decrease the number of machines. In substance the appellants' contention is that this places the performance of the contract entirely at the will of Music Service and that, accordingly, no decree could be rendered against Music Service requiring it to perform its obligations under Clause 1.a, and hence that the agreement is lacking in mutuality of remedy.

The doctrine of mutuality of remedy as stated in *Fry on Specific Performance* is one which has received wide recognition in the law but which has also come under very severe criticism and is now either discredited or restricted within more narrow limits than those in which it was formerly stated as requiring that specific performance must be mutually available to both parties in order to be available to either. See *Cor-*

bin, *Contracts*, Vol. 5, Secs. 1180 *et seq.; Williston, Contracts,* Rev. Ed., Vol. 5, Secs. 1433 *et seq.; Restatement, Contracts,* Secs. 372-373.

Section 372 of the *Restatement, Contracts,* reads as follows: "(1) The fact that the remedy of specific performance is not available to one party is not a sufficient reason for refusing it to the other party." This is an express repudiation of the doctrine of mutuality in one of the forms in which it used to be stated.

*Williston, op. cit.,* Sec. 1440, refers to Sec. 372 (1) of the *Restatement,* and then quotes with approval Sec. 373 of the *Restatement* that "Specific enforcement may properly be refused if a substantial part of the agreed exchange for the performance to be compelled is as yet unperformed and its concurrent or future performance is not well secured to the satisfaction of the court." The learned author then continues: "This rule is flexible enough to allow wide discretion in granting or refusing specific performance, thus obviating the difficulties inherent in stating a general rule to cover all the situations. For example, when the party seeking specific performance has fully performed, or is now tendering complete performance, clearly specific performance should be granted. Where the contract is executory on both sides, the court may still give specific performance if it is satisfied that the person seeking relief will continue to perform."

In accordance with Williston's views just stated, it has been held in this State that where a contract involving the rendition of personal services on one side has been performed by the party agreeing to render such services, or performance has been prevented by the wrongful conduct of the other party, specific performance may be granted at the suit of the party who has performed (or has been prevented by the opposite party from performing) the agreed services. *McKeever v. Washington Heights Realty Corp.,* 183 Md. 216, 37 A. 2d 305; *Snodgrass v. Stubbs,* 189 Md. 28, 54 A. 2d 338; *Eastern Woodworks, Inc. v. Vance,* 206 Md. 419, 112 A. 2d 231.

*Corbin, Contracts,* Vol. 5, Sec. 1181, states:

"It is believed that the chief if not the only pur-

pose that underlies all the various formulations of the rule requiring mutuality of remedy—the rule that the plaintiff shall not get specific enforcement unless the defendant could also have obtained it had he been the injured party and can still do so in the future if it becomes necessary—is to make certain that the court shall not compel a performance by the defendant for which he may fail to receive the agreed exchange performance."

In Sec. 1183, Corbin adds:

"The primary rule that the decisions will now sustain, in lieu of the broken-down requirement of mutuality of remedy, is this: The court may properly refuse specific enforcement if some substantial part of the agreed exchange for the defendant's performance has not yet been rendered and its performance is not sufficiently assured to the satisfaction of the court."

In Sec. 1184, Professor Corbin explains the reluctance of courts to grant specific performance for personal services to be rendered in the future on the ground that there is insufficient security for the rendition of such service. Among the many cases which Corbin explains on this basis is *Reed v. Reed*, 165 Md. 604, 169 A. 798, which is very strongly relied upon by the appellants. See also the comment on *Reed v. Reed* in *Snodgrass v. Stubbs*, 189 Md. 28, at p. 48, 54 A. 2d 338, at p. 347.

There is a well recognized difference between mutuality of obligation and mutuality of equitable remedy. *Liggett Co. v. Rose*, 152 Md. 146, 136 A. 651. *Duvall v. Myers*, 2 Md. Ch. 401, and *Dixon v. Dixon*, 92 Md. 432, 48 A. 152, both cited by the appellants, seem to accord with the rule as stated in the *Restatement* and by Williston and Corbin. In our view, the rule with regard to the true basis of the requirement of mutuality of remedy is correctly stated by these authorities.

At the outset the appellants' argument ignores any effect which may be given to the fact that a part of the consideration

for their agreement not to install or permit the installation of competing equipment in their restaurant has been received. They got the $3,000 loan, which seems to have been the major objective of their bargaining with Music Service, and as we understand the contract they expressly agreed to an injunction on the basis of having received that very consideration. The case is very like *Ziehm v. Steil Brewing Co.,* 131 Md. 582, 102 A. 1005. There, Ziehm wished to go into the saloon business and consulted the Brewing Company about finding a place of business. He did not have enough money to buy a saloon which the Brewing Company suggested and which he liked, and he could not borrow enough money on the security of the property alone to make the purchase. He asked the Brewing Company for aid. As a result, the Brewing Company and its president guaranteed repayment of the loan to a building association which then granted the loan to Ziehm. An agreement was made between Ziehm and his wife and the Brewing Company reciting the granting of the loan, the giving of the guarantees and the execution of a mortgage to secure the loan, under which the Ziehms agreed to sell no beer other than Steil beer at this saloon for a period of ten years (being free to sell any wines or liquors they chose), and agreed to pay weekly for the beer at the ruling market price. The agreement further provided that in case of default in any of the provisions of the agreement the Ziehms' interest in the property should belong to the Brewing Company, but if they performed all of their obligations the property should be reconveyed to the Ziehms. Something over a year later Ziehm paid off the mortgage and then sought to have the agreement with the Brewing Company annulled. One of the grounds was alleged lack of mutuality. The Court gave two answers to this contention. First, it pointed out that Ziehm had received the benefit, in accordance with the agreement, of the guarantee of the building association loan by both the Brewing Company and its president, and said: "This being so there was good and valuable consideration moving from the Brewing Company to Mr. Ziehm sufficient to support the agreement executed between the parties." The Court also held that although Ziehm agreed to buy beer from the Brewing

Company, and there was no express agreement on the part of the Brewing Company to sell beer to him, there was an implied obligation on the part of the Brewing Company to sell to Ziehm. The contract was upheld.

*Hendler Creamery Co. v. Lillich, supra,* presented a like question and reached a like result. It involved a suit for an injunction to restrain violation of a contract to purchase only the plaintiff's ice cream and like products. In that case an ice cream manufacturer and a drugstore proprietor entered into an agreement under which the manufacturer was to furnish, and did furnish, refrigerating equipment for the drugstore and agreed that it should remain there for a period of three years, and the proprietor of the drugstore agreed that during such period he would purchase all of the frozen products made or processed by the ice cream manufacturer which he might require in his business and that he would not sell the ice cream products of other manufacturers or display any advertising of such products made by other manufacturers. Upon breach of the agreement by the drugstore proprietor the ice cream manufacturer brought suit for an injunction to prevent continued violations. Thus, as Judge Digges said for the Court, "the appellant is seeking by his bill to secure specific performance of this contract by way of injunction restraining its breach." The appellee demurred to the bill and the lower court sustained the demurrer. This Court reversed the decree. Lack of mutuality was asserted by the druggist because the contract did not expressly provide that the ice cream company should sell and furnish the products which the druggist agreed to buy. At page 199 of 152 Md. (p. 634 of 136 A.) this Court said:

"To hold that this contract is void for lack of mutuality, we must find that the party sought to be held is bound to do or refrain from doing something, while the other party to the contract is not bound to do anything; or in other words, we must find that there was no consideration received by the appellee in return for the things which he agreed to do and not to do. We are unable to so find, from this agreement."

The Court then held that the furnishing and installation of the refrigerating equipment on the druggist's premises and the

ice cream company's agreement to let it remain there for three years, without any cost of installation or rental charge being payable by the druggist, constituted consideration and that there was an implied obligation on the part of the ice cream company to furnish the products which the druggist was obligated to buy, which also constituted consideration. The Court cited and relied upon *Wood v. Duff-Gordon,* 222 N. Y. 88, 118 N. E. 214, and *Ziehm v. Steil Brewing Co., supra,* and held that on the facts alleged in the bill the ice cream company was entitled to the injunction which it sought.

The *Hendler Case* was cited and followed in *Foster-Porter Enterprises v. De Mare, supra,* on both grounds. In that case the manufacturer of a mechanical device for pitching baseballs entered into an agreement with a distributor under which the manufacturer agreed to sell and the distributor agreed to purchase such machines—five of them at once—and the manufacturer appointed the distributor (subject to certain exceptions) its exclusive sales representative for two states. There was a further provision that the distributor was not obligated to purchase any more machines for a period of six months after the date of the agreement upon the understanding that the distributor would construct a single baseball batting range as promptly as possible, such construction to begin as soon as the first five machines were delivered. No specific number of machines, apart from the initial order of five, was stated in the agreement. A default clause empowering the manufacturer to terminate the agreement if the distributor "does not sell . . . . . . machines, or more" during each twelve-months period after the first, experimental period of six months was stricken out of the agreement. Suit was brought by the distributor to enjoin the manufacturer from cancelling the agreement between it and the distributor, as the manufacturer had attempted to do, and to enjoin the manufacturer from entering into any agreement with others for the sale of pitching devices in contravention of the agreement with the distributor. (The bill also sought to enforce an alleged parol agreement between the parties. This issue was decided adversely to the distributor and is not pertinent in the present case.)

The manufacturer asserted that the agreement was lacking in mutuality because of the absence of any provision for the purchase of any specific number of machines after the first purchase and because of the absence of any term for the duration of the contract. This Court, in an opinion by Judge Markell, rejected both contentions.

As to the first of them, the Court said: "The plain meaning of the basic provision that 'the Seller agrees to sell and the Distributor agrees to purchase' is that Distributor agrees to purchase as many machines as, by his best endeavors, he is able to sell.[1] *Hendler Creamery Co. v. Lillich,* 152 Md. 190, 136 A. 631, 60 A. L. R. 207, was the converse of the instant case. It was contended that the contract lacked mutuality because the seller was not obligated to sell. This contention was rejected on two independent grounds, each applicable in the instant case. An express obligation of the seller to install machinery for the buyer was held a sufficient consideration for the buyer's undertakings to enable the seller to enforce them by injunction." In the present case, as in *Ziehm v. Steil Brewing Co.,* in the *Hendler Case* and in the *Foster-Porter Enterprises Case,* a consideration has actually been received—in this instance the loan. As we have pointed out the contract states that the Proprietors' consent to an injunction against violation of the agreement is "because of the *aforementioned* consideration passing to him." (Italics supplied.) This appears to refer to the loan made by Music Service to the Proprietors.

In the *Hendler Case* there was an express statement in the ice cream company's bill to the effect that it was willing that its equipment should remain on the druggist's premises until the end of the lease, which was the period for which the injunction was sought. There is no comparable allegation in the bill in the instant case, but on the other hand, since the loan had already been made and its repayment to the bank had been effected by the voluntary act of the appellants, completely without any pressure or request from the appellee (in-

1. Followed in *Eastern Woodworks, Inc. v. Vance,* 206 Md. 419, 112 A. 2d 231.

deed, without its knowledge), there would be no apparent basis for a claim by the appellants of failure of consideration on this score. In the *Ziehm Case* the loan had been repaid before the suit was instituted; and in the *Foster-Porter Enterprises Case,* the baseball batting range had been built. We accordingly hold that the granting of the loan was sufficient consideration to support the covenant not to install or permit the installation of competing machines.

We are also of the opinion that, as in the *Hendler Case,* there is an independent ground upon which the decree granting an injunction against the use of competing machines was proper. This goes to the very heart of the appellants' case and is simply that the promises of the appellee were not illusory.

The appellants construe the clause permitting Music Service to change or withdraw machines in case of necessity as giving the appellee an absolute option to avoid all obligations under the agreement. We do not think so.

In the recent case of *Tyler v. Capitol Indemnity Insurance Co.,* 206 Md. 129, 110 A. 2d 528, where a wider option as to continued performance was given to one party, a similar contention was raised. There, a man charged with a criminal offense was arrested and was released on bail. While at liberty he committed another offense for which he was also arrested and indicted. The surety company which had furnished the bail bond on the first of these offenses declined to furnish bail on the second and surrendered the defendant to custody under the first charge. This occurred within a few days after the accused had been released from custody on that charge. Suit was brought to recover the premium paid for the bail bond on the ground that the contract "was absolutely void *ab initio,* since the defendant's promise was illusory and the contract therefore was void for want of mutuality." Judgment for the defendant surety company was affirmed. In the opinion, written by Judge Hammond, this Court said: "As has often been pointed out by the text writers, there is much confusion of thought as to the requirement of mutuality, and the decisions reflect it." After citing and quoting from *Williston, Contracts,* Rev. Ed., Sec. 141, Judge Hammond cited *Cor-*

*bin on Contracts,* Vol. I, Chapter 6, and quoted from an article by the same author on the *Effect of Options on Considerations,* 34 Yale Law Journal 571, at page 585, the statement that: "The conclusion should be drawn that an unlimited option to cancel does not invalidate a contract where it can be shown that it does not wholly defeat consideration."

The Court referred to the *Restatement, Security,* Sec. 203, which defines bail bonds, and to Sec. 204 (1) which states that "The surety on a bail bond may, at his discretion, apprehend and surrender the principal." The Court also quoted from the comment on this Section the statement that: "If the surety believes that there is danger of the defendant's disappearance, the surety may end his own responsibility by surrendering the defendant to the proper officers." At pages 135-136 of 206 Md. (page 531 of 110 A. 2d) Judge Hammond continued: "The contract between the parties in this case provided that 'in consideration of the execution by the Company of such bond or undertaking', the appellant covenanted and agreed with the company that he would pay the premium specified in the application and that 'the Company may at any time take such steps as it may deem necessary to obtain its release from any and all liability under any of said bonds or undertakings * * * the Company may secure and further indemnify itself against loss, damages and/or expenses * * * in any manner it may think proper including surrender of the defendant (either before or after forfeiture and/or payment) if the Company shall deem the same advisable'. Finally, in capital letters, was included the following: 'THE PREMIUM ON THIS BOND IS NOT RETURNABLE'. The assertion by the appellant that the bail bond was void *ab initio* apparently is one that has never been accepted by a court. The contract to furnish the bond, and the bond itself, in the case before us do not vary in any material way from countless similar instruments which have been executed and acted under through the years. The promise of the appellant to pay $200.00 premium was countered by the promise of the appellee to procure his release from jail on the terms agreed upon, which were declaratory of the common law. No question is raised as to fraud or bad faith. It is not sug-

gested that the bonding company at the time of the filing of the bond did not intend to remain as surety until trial, as generally it would have. The appellant was free to set his own value on his release from jail, knowing and agreeing that the right to remain at liberty could be terminated by the surety at any time, and that in such case, the premium would not be returned. We think there was real consideration."

The agreement in the instant case permits Music Service, in case of any necessity, in its sole discretion, to change or reduce the number of machines. This does not mean that Music Service can evade its obligations to furnish machines and to maintain them in satisfactory operating condition simply by declaring a "necessity" which does not exist. Not only is the right of Music Service to reduce or possibly discontinue performance in this case much less sweeping than the right of the bonding company in *Tyler v. Capitol Indemnity Insurance Co., supra,* but the contract also sets a higher requirement for relief from further performance than in cases where one party is relieved of obligation if something to be done by the opposite party is not performed to the "satisfaction" of the first party or in employment contracts which are terminable "for cause." Though much is left to the discretion of the party to whom the thing or service must be satisfactory, and the judgment of a court is not to be substituted for the honest, even though misguided, judgment of the party, his judgment must be exercised honestly and in good faith. His dissatisfaction "must be real and not pretended, capricious, mercenary, or the result of a dishonest design." *Ferris v. Polansky,* 191 Md. 79, 86, 59 A. 2d 749, 752. See also *Goldberg v. Feldman,* 108 Md. 330, 70 A. 245; *Devoine Co. v. International Co.,* 151 Md. 600, 136 A. 37. Such provisions do not render a contract illusory. "It is only where the option reserved to the promisor is unlimited that his promise becomes illusory and incapable of forming part of a legal obligation." *Williston, Contracts,* (Rev. Ed.), Vol. I, Sec. 43. See also, *op. cit.,* Secs. 104 A, 105, and Vol. IV, Sec. 1027 A, and *Foster-Porter Enterprises v. De Mare, supra.*

The contract speaks of "necessity" for making a change in machines or for reducing their number. This does not mean

that Music Service would be at liberty to withdraw any or all of its machines as a matter of its mere wish or caprice, and it is, therefore, not the equivalent of a contract cancellable at will, such as was involved in *Kahn v. Janowski,* 191 Md. 279, 60 A. 2d 519.

We are of the opinion that the decree of the Circuit Court was correct, and it will accordingly be affirmed.

*Decree affirmed, with costs.*