## EASTERN WOODWORKS, INC. *v.* VANCE

[No. 59, October Term, 1954]

420

422

*Decided March 9, 1955.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Abram C. Joseph,* with whom was *Daniel C. Joseph* on the brief, for the appellant.

*Daniel B. Leonard,* with whom were *Edward H. Burke, John J. Caslin* and *Bowie, Burke & Leonard* on the brief, for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

The appellee, Vance, filed a bill in equity in the Circuit Court of Baltimore City against the appellant, Eastern Woodworks, Inc. (Eastern) seeking a construction of an agreement between the parties, an accounting to determine the amount claimed to be due Vance under the agreement by Eastern and a monetary decree for the payment of the amount so determined. Eastern both demurred to the bill and answered, its demurrer was overruled, and the case went to trial and resulted in a decree in favor of Vance for $12,852.12, with interest from the date thereof. The appeal is from that decree.

The questions presented are these: (1) Is the agreement on which the appellee's claim is founded unenforceable under the Statute of Frauds; (2) Is the agreement void as contra to public policy; (3) Did the appellee perform his part of the agreement; and (4) Does equity have jurisdiction of the case?

The agreement upon which the appellee's case is founded is set forth in a letter dated December 31, 1951, from Eastern to Vance appointing him "the firm's manufacturing representative covering all business arising out of Bendix Aviation Corporation either locally here in Baltimore or in its other locations." It then names four other concerns as "included in the group of accounts we will expect you to service" and provides for the addition of others by mutual consent. The next paragraph, which lies at the heart of the present controversy, reads as follows: "In consideration of your sales contacts and engineering efforts Eastern Woodworks, Inc. will pay you five per cent (5%) of the total contract value arising from any of these accounts during the period of the next

two years unless other compensation is mutually agreed to in writing in regard to specific jobs."

Vance is a manufacturer's representative and has been engaged in that business since 1945. He had obtained some business for Eastern prior to December 31, 1951, on which he had earned some commissions at the rate of 5% on the sales, amounting to about $2,900, but by reason of an advance of $4,500, he was overdrawn (apart from business with Bendix) on his account with Eastern by nearly $1,600. He was, however, working on some contracts with Bendix, and a statement as of December 31, 1951, showed that commissions on Bendix business reduced his overdraft to about $700.

The pending contract with Bendix was expected to be substantially larger than other contracts theretofore obtained by Vance for Eastern, and negotiations had progressed to the stage where it was anticipated that a contract would soon be executed. Vance had no written agreement with Eastern and became somewhat concerned about the matter because Mr. Robertson, the President of Eastern, had had a heart attack. The letter above referred to was written at Vance's request, and testimony indicates that it was verbally approved by the two other then directors of Eastern. Robertson was the principal stockholder of Eastern.

The projected contract on which Vance was working when the letter was written was for sets of cases for spare parts to be furnished by Bendix to the United States Air Force. The contract as executed on January 28, 1952, was for 55 sets consisting of 29 boxes per set. The price per set was $2,083.73, and the aggregate price was $114,605.15. By an amendment of the contract made on November 5, 1952, the number of cases (or boxes) per set was increased to 60, and the unit price per set was increased to $6,511.16, and the total contract price to $358,113.80. Vance was paid $2,500 by Eastern on the signing of the original contract and was allowed a drawing account of $150.00 a week against his esti-

mated commissions. These weekly payments continued until December, 1952.

Robertson died of another heart attack in September, 1952. He was succeeded briefly by Mr. Arold Ripperger as President. A controversy arose over Mr. Robertson's will, and in November, 1952, his divorced second wife, Mrs. Mae Robertson, who had for a time been employed as secretary by Mr. Robertson and who had some familiarity with Eastern's business, became President. About a month later Vance was notified by a letter dated December 12, 1952, from Eastern, signed by Mrs. Mae Robertson as President and sent with the approval of the Board, that "as a result of your failure to give Eastern Woodworks, Inc. the engineering effort and the service called for in the agreement of December 31, 1951, we must consider the agreement terminated and no further monies due to you." This suit resulted.

The case was heard on demurrer by Judge Byrnes and on the merits by Judge Mason.

1. *The Statute of Frauds.* The appellant makes these claims in connection with the Statute of Frauds: first, lack of mutuality, because the letter contains no promise on behalf of the appellee; second, that it is too vague and indefinite to be enforceable as it stands and that the deficiencies cannot be supplied by parol testimony; and third, that any "supposed" part performance cannot save the contract under the "year clause." Each of these contentions is pressed with vigor and learning but we do not agree with any of them.

With regard to the alleged lack of mutuality because of there being no express promise on the part of Vance in the letter of December 31, 1951, to perform any services for Eastern, we think that such an obligation is inferable from the terms set forth. In *Hendler Creamery Co. v. Lillich*, 152 Md. 190, 136 A. 631, it was objected that there was no obligation on the part of a manufacturer or processor to sell its products to a retailer because there was no express promise to do so. This Court held, however, that when the retailer accepted the manufac-

turer or processor's proposal, (which clearly contemplated sales) the latter, at the very least, came under an implied obligation to furnish the commodities. Likewise, in *Foster-Porter Enterprises v. De Mare*, 198 Md. 20, 81 A. 2d 325, it was urged that there was no mutuality of obligation because there was no express provision by which a distributor agreed, (after an initial purchase) to buy any specific number of machines manufactured by the seller. It was held, however, that, despite this lack of an express promise, the distributor became obligated to buy as many of the seller's machines as, by his best endeavors, he was able to sell. In each of these cases the obligation was implied. In the *Foster-Porter Enterprises case*, the Court quoted with approval from an opinion by Judge Cardozo, speaking for the Court of Appeals of New York in *Wood v. Lucy, Lady Duff-Gordon*, 222 N. Y. 88, 90-91, 118 N. E. 214, (which case had also been cited in the *Hendler Creamery* case) the following: "It is true that he does not promise in so many words that he will use reasonable efforts to place the defendant's indorsements and market her designs. We think, however, that such a promise is fairly to be implied. The law has outgrown its primitive stage of formalism when the precise word was the soverign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed [citing authorities]. If that is so, there is a contract."

Eastern's further objection, pressed under its fourth contention relating to equity jurisdiction, that an agreement to render personal services is unenforceable, is beside the point, since the evidence appears adequate to support the conclusion that Vance did accept Eastern's proposal and did render services in accordance with the agreement. In fact, as well as can be determined from a statement prepared from Eastern's books by an accountant employed by Vance, which does not purport to go into details of identification of contracts and amend-

ments thereto, it appears that somewhere in the neighborhood of 75% to 80% of the total billings upon which Vance's claim is based grew out of the contract which he was working on when the letter of December 31, 1951 was written and which was actually executed and later substantially increased by an amendment made during his period of service. If we assume that some of the contracts were obtained after Vance was notified of his discharge and before December 31, 1953, the amount of such sales may serve as a measure of damages for loss sustained by Vance as a result of Eastern's breach of the contract, and such damages may be awarded to him in this proceeding. See *McKeever v. Washington Heights Realty Corp.*, 183 Md. 216, at 226, 37 A. 2d 305, which aso involved a sales agency.

*Benjamin v. Bruce*, 87 Md. 240, 39 A. 810, is heavily relied upon by the appellant, but it is distinguishable from this case both as to damages and as to the enforceability of the contract. On the subject of damages, in the *Benjamin* case, the agreement was that the agent should be paid 5% commission on all sales made by him in the territory assigned to him; and though the principal was obligated not to sell in that territory, there was no provision by which he was to pay 5% commissions on any sales made by him in violation of his covenant. It was accordingly held that there was no definite, fixed and ascertained sum payable to Benjamin either by way of commissions or for breach of contract, upon sales not made by him.

On the matter of enforceability, it was pointed out in the *Benjamin* case that the claim was not for services preformed. In the instant case, Vance did perform services under the contract, and Eastern reaped benefits therefrom. The Court also pointed out that Benjamin did not obligate himself to sell any of the products of the principal. In this respect also we think that the present case differs from the *Benjamin* case.

Eastern's objection that the contract is too vague and indefinite to be enforced also seems without merit. This

objection is directed mainly against the use of the term "contract value" as the measure of commissions. Probably a better term could have been found, but both parties seem to have understood it without any question at the time of its execution and at least for some time thereafter. The practice established by them prior to the letter of December 31, 1951, was to base commissions on the amounts billed to Eastern's customers on contracts procured by Vance. This was also the practice followed after that date, and we think that evidence thereof was properly considered. See *McKeever v. Washington Heights Realty Co., supra.* See also, as to the practical construction put upon a contract by the parties, if its meaning is doubtful: *Baltimore & Ohio R.R. v. State,* 45 Md. 596; *Mattingly Lumber Co. v. Equitable Bldg. & Savings Ass'n,* 176 Md. 403, 5 A. 2d 458.

The third ground of attack allegedly based on the Statute of Frauds is that part performance will not save a contract which is unenforceable under the "year clause". Since this contract was to run for more than a year, the Statute had to be satisfied in order to make it enforceable. Appellant's theory seems to be that the contract was not complete in itself and could not be aided by part performance or an oral agreement, and that any remedy for the part performance would have to be by a suit at law based on quantum meruit. Since we think that the contract is not deficient for lack of mutuality and that it is sufficiently definite in its terms to be enforceable and since there is no question about the fact that it was signed by the party to be charged— Eastern—we do not consider this contention applicable. See *Sinclair v. Weber,* 204 Md. 324, 104 A. 2d 561; *Restatement, Contracts,* Section 211.

2. *The Question of Legality.* The appellant urges vigorously that an agreement for the payment of commissions on a subcontract for materials to be furnished to the Government for defense purposes is against public policy and hence void. The argument is sought to be buttressed from several angles.

First, there is an argument based upon the rule stated in *Providence Tool Co. v. Norris,* 69 U. S. 45, and restated in *Muschany v. U. S.,* 324 U. S. 49, that contingent fee contracts to obtain business from the Government are invalid because of their tendency towards corruption. In *Steffey, Inc. v. Bridges,* 140 Md. 429, 117 A. 887, this Court cited the *Providence Tool Company* case with approval, but in *Frenkil v. Hagan,* 146 Md. 94, 125 A. 909, recognized that "there are certain legitimate services which may be contracted for even in connection with the procurement of government contracts." See also *Williston, Contracts,* Rev. Ed., Section 1729A, and *Steele v. Drummond,* 275 U. S. 199. It will be noted that the cases above cited involved dealing directly with the Government or other governmental units and not with subcontractors. The corrupting effect of such contracts upon government has been regarded as the root of the evil. See also *Hazelton v. Sheckells,* 202 U. S. 71.

Second, there is an argument based on Executive Order No. 9001, U. S. C. A., Title 50 App., pages 675-676. This Order requires a contractor entering into a contract with any of several specified Government departments to warrant that he has not employed any person to solicit the contract on a commission or contingent fee basis, with an exception in favor of contracts made through a *bona fide* established commercial or selling agency maintained by the contractor for the purpose of securing business. There is an almost identical provision in 41 U. S. C. A., Section 153, which is a part of the "Armed Services Procurement Act of 1947." In case of breach of the warranty the Government may annul the contract or may deduct the amount of the commission or contingent fee. In *Mitchell v. Flintkote Co.,* 185 F. 2d 1008, the Court of Appeals for the Second Circuit took the view that an agreement contra to the warranty was illegal. A note on this case in 64 Harv. L. Rev. 1200 questions this conclusion and suggests that it would be well for Congress to state explicitly that such contracts are illegal, if that is what it thinks should be the rule.

*Mitchell v. Flintkote* also took the view that since defense-contracts were matters of Federal concern, Federal law was controlling, and it declined to follow New York law on the question as exemplified by *Leachy v. Brooklyn Waterfront Terminal Corp.*, 272 App. Div. 781, 69 N. Y. S. 2d 596, appeal den. 297 N. Y. 1037. For the purposes of this case (but without finding it necessary to decide the point) we may accept the view of the *Mitchell* case as to the controlling law.

The Federal statutes dealing with renegotiation constitute the third source from which Eastern seeks to derive support for the theory of illegality. We think they cut the other way. The Renegotiation Act of 1951 (like that of 1943) makes a clear distinction between contracts and subcontracts and, by a statutory definition which departs widely from the usual meaning of the term, includes as a subcontract (Sec. 103 (g) (3) of the Act, U. S. C. A., Title 50 App., Sec. 1213 (g) (3), page 652) :

"(3) any contract or arrangement * * * under which—

(A) any amount payable is contingent upon the procurement of a contract or contracts with a Department or of a subcontract or subcontracts; or

(B) any amount payable is determined with reference to the amount of a contract or contracts with a Department or of a subcontract or subcontracts; or

(C) any part of the services performed or to be performed consists of the soliciting, attempting to procure, or procuring a contract or contracts with a Department or a subcontract or subcontracts."

The Renegotiation Acts do not declare such contracts illegal; on the contrary, they provide for the recapture of excessive profits. Vance's agreement with Eastern falls squarely within the above definition of a subcontract. See *Armstrong v. War Contracts Price Adj. Bd.*,

15 Tax Ct. 625, aff'd 194 F. 2d 875, cert. den. 343 U. S. 967.

Renegotiation, it will be noted, proceeds on the theory of excessive cost, not corruption. (See note in 64 Harv. L. Rev. 1200, above referred to.) It does not attempt to bar contingent fee contracts; it merely limits profits. Indeed, a proviso which follows the definition of a subcontract above quoted adds that "nothing in this subsection shall be construed (i) to affect in any way the validity or construction of provisions in any contract with a Department or any subcontract * * * prohibiting the payment of contingent fees or commissions; * * * ." Such a proviso would be wholly superfluous if the Renegotiation Act itself rendered contingent fees or commissions on subcontracts illegal.

Bearing in mind the sharp distinction made by Congress between contracts and subcontracts and the fact that neither the Executive Order No. 9001 nor its counterpart in the Armed Services Procurement Act imposes any prohibition (either by direct declaration or by requiring a warranty) against commission or contingent fee agreements for the procurement of business made by subcontractors, we are of the opinion that such agreements have not been made invalid by Federal legislation (or by Executive Order issued thereunder). Congress was undoubtedly aware of the problems of cost and of possible corruption and it appears to have made a choice which makes (or at least may make) such agreements illegal if they pertain to obtaining contracts directly from the Government, but not otherwise, and which also sought protection through renegotiation. We do not believe that we should undertake to do by judicial decision what Congress has declined to do by legislation.

No warranty against contingent fees or commissions is required by Sec. 104 of the Renegotiation Act of 1951, and there is nothing in Clause 30 of the general conditions of the subcontract awarded Eastern by Bendix either containing or calling for such a warranty. Nor does Clause 22, which calls for compliance with State and Federal Laws, require such a warranty, since there is

no violation of either by the fact that Vance was employed on a commission basis.

Neither Vance's suggestion of a raise in price above what Eastern was apparently ready to bid in its negotiations with Bendix (which Eastern adopted) nor his alleged recommendation or demand that Eastern make certain gifts to promote business relationships (which Eastern rejected) renders his original contract with Eastern invalid.

3. *Performance by Vance.* Eastern's principal contention is that Vance was required under the contract to perform engineering services and that he was incapable of doing so because of his lack of education. There is also an effort to show that since Eastern did business with Bendix before and after Vance's employment, and because others in Eastern's employ worked on getting the big packing case subcontract, Vance's work as a salesman amounted to little. All of these matters were in issue before the Chancellor. He found that the plaintiff had "met the burden of proof", and we see no reason to disturb his findings on the facts. With regard to the matter of engineering services, the actual language of the contract called for Vance's "engineering efforts." The testimony indicates that Vance rendered some assistance of a more or less technical and mechanical nature, though it is clear that he was not a professional engineer and lacked the training of one. However, he does appear to have contributed such "engineering efforts" as he was capable of, and he was not employed to render any specific expert engineering services. It may be noted that Eastern, in submitting quotations under date of January 17, 1952, which appartnetly resulted in the contract of January 28, included a charge of $750.00 for making certain drawings, but opposite the item "Quote on engineering for 29 boxes listed in tables" * * * wrote "No Charge."

We think that on the question of performance of his obligations as a salesman, the evidence supports a finding that Vance was largely instrumental in getting the principal contract and its enlarged amendment from Bendix.

Some point was made of the fact that Vance procured no business for Eastern from any of the concerns other than Bendix. Vance's answer to this that the Bendix business kept him too busy to work on the others was apparently accepted by the trial court, and we see no reason to disturb this conclusion.

4. *Question of Equity Jurisdiction.* Eastern's principal contention on this point is that Vance failed to establish a "right *to* an accounting" and that "the ultimate ability of equity to redress wrongs on both sides where there are mutual obligations must be clear." It relies on *Reed v. Reed,* 165 Md. 604, 169 A. 798, where a contract for personal services by the plaintiff was involved. The Court pointed out that such a contract could not be enforced by equity, but also pointed out, in sustaining a demurrer, that the contract was wholly executory as to all of the respective duties under its provisions. That is not the case here. Vance had performed substantial services before his dismissal and had become entitled to compensation therefor. What has already been said with regard to mutuality under the first main point raised on this appeal is applicable on this question and shows that the plaintiff is entitled to relief in equity. See particularly *McKeever v. Washington Heights Realty Corp.,* 183 Md. 216, 37 A. 2d 305, already cited on the first point. As that case indicates, it makes little difference whether the commissions on sales after Vance's dismissal are considered due him strictly as a matter of accounting or by way of damages for breach of the contract awarded in equity in order to give complete relief.

There appears to be no controversy as to the net amount to which Vance is entitled, after offsetting amounts previously paid him by Eastern, if he is entitled to recover at all, so that this point requires no further discussion.

In accordance with the views above expressed, the decree of the lower court is affirmed.

*Decree affirmed, with costs to the appellee.*