## HUGHES ET AL. *v.* THURMAN

[No. 111, October Term, 1956.]

170

*Decided May 2, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Francis B. Burch* and *Paul T. McHenry, Jr.,* with whom were *Allen, Burch and Allen* on the brief, for appellants.

*John Henry Lewin,* with whom were *David C. Green* and *Venable, Baetjer & Howard* on the brief, for appellee.

BRUNE, C. J., delivered the opinion of the Court.

The plaintiff, Allen G. Thurman (Thurman), recovered a judgment for $6,960 in the Superior Court of Baltimore City against the defendants, Joseph F. Hughes (Hughes) and Joseph F. Hughes and Company, Inc. (the Hughes Company) on a claim for personal services rendered pursuant to an alleged oral agreement. The defendants appealed.

The case was tried by Judge John T. Tucker, sitting without a jury. At the conclusion of the case he delivered an opinion in which he thoroughly reviewed the evidence and arrived at his findings of fact and conclusions of law. There was some conflict of testimony in the trial court on several matters, but most of them are not brought into issue on this

appeal. The real question presented is whether or not the evidence supports the conclusion of the trial court that the obligation of the defendants to the plaintiff, which the trial court found to exist, was several, and not joint.

Hughes and the Hughes Company, of which he is the president, are engaged in the construction business in Baltimore. Early in 1951 they decided to seek Government business and foreign contracts. As a result, Hughes, his friend and advisor, William B. Norris (Norris), and Lawrence B. Fenneman (Fenneman), then counsel for Hughes and the Hughes Company, visited Thurman at the latter's office in Washington, D. C. At the time Hughes and his Company were not familiar with procedures relating to military construction matters and Federal Housing Administration (FHA) loans or financing in connection therewith. Norris was then, and until November 30, 1951, continued to be, an employee of the Baltimore office of the FHA. Thurman had been in Government employ for a number of years prior to 1947, and for about the last six of those years had been employed by the Small Business Committee of the Senate. He started a business of his own in Washington in 1947 acting as a representative for firms or corporations described by him as having "business before the different Government agencies in relation to contractual work, loans." He stated that most of his work consisted of gathering detailed information and "expediting matters" with different agencies.

As a result of this February, 1951, visit, Thurman was employed by the Hughes Company under a retainer of $1,000 to look for contracts for that Company, with the understanding that he would be paid additional compensation to be agreed upon later if he developed any construction projects which the Hughes Company might go into.

Thurman's efforts and contacts produced nothing of interest to Hughes or his Company until September, 1951. In that month Thurman learned that certain clients of Mr. Delos G. Smith, a Washington lawyer experienced in military construction contracts and FHA mortgage financing in connection therewith, were in a situation which might be of interest to Hughes and his Company. Thurman had introduced

Hughes, Norris and Fenneman to Mr. Smith during their visit in February, 1951. Mr. Smith's clients, F. S. Widre and Associates (the Widres), had been awarded the "sponsorship" of a defense housing project at Fort Eustis, Virginia, on the basis of competitive bids. The building contractor for the Widres' group had been killed in August, and the Widres had to substitute another by September 21st in order to hold their sponsorship. They were reportedly willing either to sell out entirely to someone else for $50,000 or $60,000 or to admit a new builder who would become a member of the group of associates and would share the sponsorship. As a result of negotiations initiated by Thurman and carried forward by Norris and Fenneman acting on behalf of Hughes and his Company, Hughes became one of the associates of the Widres' group and Hughes obtained a controlling voice in the sponsorship. This occurred on or about September 21, 1951. Even at that time Hughes and the Hughes Company were not obligated to pay the Widres anything unless they should later decide to go ahead with the project. In practical effect, they had an option.

Hughes and the Hughes Company were in no haste to decide whether or not to go forward with the project, and the matter remained under negotiation for a considerable time thereafter. Hughes authorized Fenneman to work out arrangements for going ahead with it, under which Hughes and the Hughes Company were to pay $50,000. This sum, Judge Tucker found, was "to cover everything, that is payment to the Widres and also whatever compensation the other three men [Fenneman, Norris and Thurman] were entitled to receive for their services." Acting in accordance with this authorization, Fenneman agreed with Norris and Thurman on November 20, 1951, that they should divide evenly between themselves (subject to the payment of $2,000 to one Carlin) whatever might be left of the $50,000 after making such payment to the Widres as might be necessary. This agreement was promptly reported to Hughes. His only objection to it (as found by Judge Tucker) was that he saw no reason for Fenneman, Norris and Thurman cutting down their shares by paying $2,000 to Carlin. Hughes later stated to a rep-

resentative of the Widres "that by settling with the Widres for thirty thousand dollars it gave him the balance of the fifty thousand dollars to pay his people."

An agreement to pay the Widres $30,000 was made orally in late November, 1951, and was confirmed in writing on December 10, 1951. Subsequently, as a result of further negotiations between Hughes and the Widres, the amount to be paid to the latter was reduced to $22,500; and after further negotiations with the Government, Hughes and the Hughes Company finally determined to go ahead with the Fort Eustis project.

Thurman's amended declaration contained three counts— two common counts (work done and an account stated) and a special count based upon an oral contract of employment. This count adopted $22,500 as the amount paid the Widres and claimed that one-third of the difference ($27,500) between $50,000 and $22,500 was payable to Thurman. Thurman also asserted an additional claim on a *quantum meruit* basis for services after December 10, 1951, which Judge Tucker rejected. Judge Tucker held that the original agreed price of $30,000 to be paid the Widres should control and that the $2,000 to be paid to Carlin should be taken into account. He accordingly found that Thurman was entitled to one-third of $18,000, or $6,000, plus interest at 6% from October 2, 1953, which amounted to $960.00.

Thurman was the sole plaintiff. He delayed bringing suit in the hope that Norris and Fenneman would join with him, but Norris had no desire to sue Hughes and Fenneman settled his $6,000 claim against Hughes on the Fort Eustis project for $4,000. Fenneman testified that he made this compromise because illness had prevented his rendering all of the services which he had expected to perform. He did not consult either Thurman or Norris about the settlement and testified that he was not undertaking to settle anyone's claim but his own. Hughes' testimony with regard to this settlement is somewhat at variance with Fenneman's; but even he made no claim that in settling with Fenneman he intended to discharge the claims of Thurman and Norris as well. Judge Tucker

found that there was no intention to discharge any claim but Fenneman's by this settlement.

The defendants' contentions on this appeal all are founded upon one proposition—that their agreement created a joint obligation to Norris, Fenneman and Thurman, and not a several obligation enforceable by any one of them against Hughes and his Company. From this they argue (a) that there was a non-joinder of necessary parties, since neither Norris nor Fenneman was a party to this suit; (b) that there was a fatal variance between the several contract with Thurman alleged in the declaration and what they term "at most a joint one"; and (c) that the settlement with one of the joint obligees operated as a discharge of the claims of all.

As Judge Tucker said, "The question as to whether a right under a contract is joint or several depends upon what the provisions of the contract are. That * * * might be called elementary, so the question in this case on this subject * * * is, What was the contract?" That question in this case is primarily a question of fact, including inferences which should be drawn from the words and acts of the parties. It is not a case in which we are called upon to interpret the meaning of an elaborate written contract. (Indeed, there was no written agreement.) There is no novel question of law involved. If the obligation were joint, all of the joint obligees (if living) would have to be parties to a suit to enforce it. *Cearfoss v. Wolfinger,* 195 Md. 49, 72 A. 2d 763.[1] *Wallis v. Dilley,* 7 Md. 237, 250. If the obligations were several, any of the obligees might sue alone to enforce his own claim. *Beckwith v. Talbot,* 95 U. S. 289. See also the *Restatement, Contracts,* § 128; *Williston, Contracts,* Rev. Ed., Vol. II, Sec. 325.

---

1. Since a joint obligation involves the right of survivorship among joint obligees, the bill in the *Cearfoss* case was defective as to parties not only for non-joinder, but also for the lack of right to sue in the plaintiff as executor of that joint obligee who had been the first to die.

Subsections (1) and, in part, (2) of Sec. 128 of the *Restatement, Contracts,* read as follows:

"(1) If a promise in a contract is made to several persons, the intention of the promisor as expressed in the contract determines whether the right thereby created is joint or whether rights are created which are several or are joint and several.

(2) If no intention is expressed in such a promise, the rights are several if the interests of the obligees in the performance of the promise are distinct; * * *"

*Williston, op. cit.* § 325, at pages 942-943, points out that it is important to observe whether the interests of the obligees are separate or whether they have but a single interest, that the rule is one of interpretation, that words must be construed in the light of the interest of the parties which they are intended to protect and that as "a further aid to interpretation, * * * where the consideration furnished by obligees is several, their interests may prima facie be regarded as several and not joint, if other features of the contract do not clearly conflict with this interpretation."

In the instant case, the considerations furnished by Fenneman, Norris and Thurman were quite distinct. Primarily, Fenneman was the defendants' counsel, though his services may have extended somewhat further, Norris was an expert advisor and apparently protagonist in FHA matters and Thurman might be briefly described as a contact man seeking to develop new business. What Carlin's function was is not at all clear, but his services seem to have been regarded most favorably by Norris and there is no suggestion that he had any interest in Thurman's compensation beyond the incidental effect which any payment to him would have on the ultimate amount to which Thurman would be entitled.

In addition to the individual nature of the services of Fenneman, Norris and Thurman, we find in the settlement between Hughes and the Hughes Company, on the one hand, and Fenneman, on the other, a very strong indication of the practical construction which the parties placed on their agree-

ment. It is quite clear that this settlement was negotiated without any consultation with Norris or Thurman, and Judge Tucker expressly found that no settlement of their claims was intended by either party. To this we may add his finding that there was no evidence of fraud on the part of anyone. This latter finding obviously proceeded on the finding that the settlement between Hughes and Fenneman was not intended to extinguish the claims of Norris and Thurman. If it had been otherwise intended, it would not have been effective under the rule stated in the *Restatement, Contracts,* § 130 and by *Williston, op. cit.* Sec. 343.

If there is doubt as to the correct interpretation of a contract, the practical construction which the parties may give to their agreement is persuasive evidence of their intention. *National Union Mtge. Corp. v. Potomac Consol. Debenture Corp.,* 178 Md. 658, 16 A. 2d 866; *Saul v. McIntyre,* 190 Md. 31, 57 A. 2d 272; *Gallagher's Estate v. Battle,* 209 Md. 592, 122 A. 2d 93; *Evergreen Amusement Corp. v. Milstead,* 206 Md. 610, 112 A. 2d 901; *Eastern Woodworks, Inc. v. Vance,* 206 Md. 419, 112 A. 2d 231. It will be recalled that Fenneman was authorized by Hughes to work out the arrangements under which Hughes and his Company were to pay $50,000 to cover everything in connection with the defendants' negotiations with the Widres and the compensation of Fenneman, Norris and Thurman. It is not without significance that both of the persons, Hughes and Fenneman, who were parties to the conversations which resulted in the creation of the oral contract, treated it as creating a several obligation when effecting a settlement thereunder.

Being of the opinion that the evidence supported the finding of the trial judge that Thurman's right to compensation under the contract was several and not joint, it is unnecessary to go into the further contentions of the appellants which are based upon an opposite view. The judgment will accordingly be affirmed.

*Judgment affirmed, with costs.*