JOHN B. ROBESON ASSOCIATES, INC. *v.* GARDENS OF FAITH, INC.

[No. 338, September Term, 1960.]

*Decided July 11, 1961.*

*Motion for rehearing filed August 3, 1961, denied September 13, 1961.*

The cause was argued before BRUNE, C. J., and HAMMOND, PRESCOTT, HORNEY and SYBERT, JJ.

*J. Elmer Weisheit, Jr.,* and *Arthur W. Machen, Jr.,* with whom were *Russell R. Reno, Jr.,* and *Venable, Baetjer & Howard* on the brief, for the appellant.

*Charles O. Fisher* and *Richard C. Murray,* with whom were *Smith & Harrison* on the brief, for the appellee.

PRESCOTT, J., delivered the opinion of the Court.

This suit was instituted in the Circuit Court for Baltimore County, in equity, for the construction of a sales agency contract and for an accounting in damages arising from its alleged wrongful termination. The decree of the chancellor dismissed the bill of complaint of the appellant for reasons stated in an oral opinion delivered from the bench.[1]

In the spring of 1957, Raymond F. Cushing, who had been in the cemetery business for a number of years, met with John B. Robeson, president of the appellant, to consider the making of a contract, whereby the appellant would handle the sales for a new cemetery to be known as "Gardens of Faith." After negotiations had at several meetings between Cushing and Robeson, a written contract was executed on April 27, 1957. It was understood between the parties that this contract would be assigned to a new corporation to be formed by Cushing, Gardens of Faith, Inc., and this, in due time, was done.

Under the terms of the contract, the appellant was employed as Director of Sales of the cemetery company for a period of three years, commencing on May 27, 1957. The agreement provided that the appellant should receive a 5 per cent commission on "all net sales [2] of pre-need cemetery lots [those not needed for immediate interment]," and a like commission on all "at need" sales (those purchased for immediate interment). In addition, the appellant was to receive a commission of 5 per cent on "bronze memorials" sold.

Under paragraph 9 (a) of the agreement, the appellant

---

1. When a declaration of rights is requested and the plaintiff is not entitled to the relief requested, the bill should rarely be dismissed, but the rights of the respective parties should be declared. Shapiro v. County Comm., 219 Md. 298, 149 A. 2d 396.

2. The "net sales" here referred to were gross sales made on a deferred purchase plan, subject to cancellations for non-compliance with the terms of sale, and subject to be reduced by an agreed amount of costs for financing and insurance.

was given full and exclusive responsibility for, and control of, the sales program, and Robeson [personally] was only required to "devote as much time as he [deemed] necessary to the maintenance and operation of this program."

The case turns upon the provisions of paragraph 9 (b), so they will be set forth in full:

> "Robeson guarantees a minimum of $700,000.00 gross sales over and above cancellations for the year beginning June 1, 1957, and the same amount for each subsequent year under this agreement. However, if Robeson exceeds his guaranteed quota the first two years of the term by $200,000 or more, his guarantee for the third year will be reduced to $500,000. Forty per cent (40%) of the annual guaranteed quota must be attained by December 1, 1957, and seventy-five per cent (75%) by March 1, 1958. On each of these dates, and quarterly thereafter, through the second year of the term, and semiannually during the third year, the quota attained by Robeson will be reviewable by the Cemetery, with the right in the Cemetery to terminate this contract at its option if Robeson has substantially failed to attain guaranteed quota."

The appellant duly entered upon the performance of its duties under the contract, and it is agreed that in the first year it fully measured up to its contractual obligations. Gross sales, after cancellations, including service charges and receipts from bronze memorials were $758,579 for that year.

During the first year, the salesmen of the appellant had been working through a list of union members as prospective customers, but, by June 1, 1958, this list was nearly exhausted. In addition, many of the remaining prospects were out of employment due to a recession. Gross sales, including service charges and bronze memorials for the first quarter of the second year, amounted to only $102,081 and in the second quarter thereof to $153,882. Cushing testified that he reviewed these figures on the basis of a quarterly quota of $175,000 for the second year, and, although he talked to Robe-

son about them, he took no action concerning a termination of the contract.

These declining sales called for "quite a transition" in the sales organization and the methods of obtaining leads. The appellant instituted an intensive program of direct door-to-door surveying; and Robeson, personally, went out in the field with the sales manager, divisional managers and salesmen in order to show them an effective way of securing leads.

The amount of the sales in the second year was a matter of great importance to Cushing, for the purchase of the cemetery property had been financed by the issuance of "land certificates," and Cushing had personally guaranteed the holders of these certificates that they would be repaid from the sales of lots the full amount of their investments ($200,000) in two years, which, upon the $700,000 quota per year, he "figured would pay out in two years."

In due time, Robeson's efforts were rewarded and he got his new program "rolling." Sales for the third quarter of the second year amounted to $225,290, and for the fourth quarter $204,631. The certificate holders received the full amount of their guaranteed $200,000 from the operation of the cemetery company in the first two years; hence Cushing's personal guarantee to them was exonerated.

Although the appellant's sales for the last two quarters had substantially exceeded the $175,000 quotas, on June 4, 1959, the appellee wrote a letter to the appellant terminating the contract for failure to achieve "minimum guaranteed gross sales."

The parties agree that if the words in paragraph 9 (b) giving the appellee the right to terminate the contract "if Robeson has substantially failed to attain guaranteed quota" were accorded their usual and ordinary meaning, Robeson did not substantially fail to attain the total guaranteed quota for the first two years. But the appellee contends that the parties imported to the quoted words a limited and special meaning, and argues its contention is supported by certain oral testimony admitted without objection. In the view that we take of the case, it will not be necessary to answer this claim.

It is, of course, necessary to consider what the parties in-

tended by paragraph 9 (b). It seems clear that the appellant guaranteed a minimum of $700,000 in gross sales, over cancellations, in each of the three years' existence of the contract (except in the third, if he had exceeded his quotas for the first two years by $200,000). However, in none of the three years was the $700,000 yearly quota to be determined on an overall annual basis, i.e., that sales amounting to $700,000, made at any time during the year, would constitute a compliance with the contract, and the $700,000 quota could only be "reviewed" at the end of a year to determine whether it had been met. On the contrary, said sales had to be achieved in named quotas by a specified time in each year, or the quotas would be "reviewable" by the appellee with the right to terminate the contract if the appellant "substantially failed to attain guaranteed quota." In the first year, forty per cent ($280,000) of that year's guaranteed quota had to be attained by December 1, 1957,[3] seventy-five per cent ($525,000) by March 1, 1958, and 100 per cent ($700,000) by June 1, 1958; otherwise the quotas would be reviewable by the appellee on those dates with the right of termination. During the second year, the quotas were reviewable quarterly, which meant that the appellee had the right, as of September 1, 1958, to review the amount of the sales then attained by the appellant, and if the sales were less than $175,000, to terminate the contract. It also meant that the appellee again had a right to review the second-year's quota as of December 1, 1958, and if the sales at that time were less than $350,000, it once more had a right to terminate the contract, provided it had not waived or released any of its rights concerning termination. Likewise it had the right to review the quotas attained as of March 1, and June 1, 1959, and, if the sales were less than $525,000 and $700,000, respectively, it had the right to terminate the contract, if none of its rights relating to termination had been waived or released.

There are few principles of contract law better established,

-------

3. Most of the figures that follow are, of course, subject to the provision "if Robeson has substantially failed to attain guaranteed quota."

or more uniformly acknowledged, than that a party to an executory bilateral contract, who keeps the same in existence after a known breach by the other party and accepts further performance from the party who has committed the breach, waives the breach, in the absence of an assertion of his intention to retain the rights accruing to him as a result of said breach, assented to by the other party; and if the injured party thereafter does not make good his promises of performance, he is responsible for such failure. 3 Williston, *Contracts* (Rev. ed.), § 688, states it thus:

> "The principle is general that whenever a contract not already fully performed on either side is continued in spite of a known excuse, the defense thereupon is lost and the injured party is himself liable if he subsequently fails to perform, unless the right to retain the excuse is not only asserted but assented to."

In Restatement, *Contracts,* § 309, we find:

> "Where the duty of a party to a bilateral contract has been discharged by the failure of a condition to exist or to occur or by the actual or threatened non-performance of a return promise, he is again subjected to the duty if he renders any further performance, or assents to the rendering by the other party of any further performance of a condition or promise beyond what is due as the exchange for performance previously rendered, provided that he renders or assents to such further performance
> (a) with knowledge of the facts establishing his discharge, or * * *."

See particularly *Comment a,* thereunder. Professor Corbin states the same principle in 3 A Corbin, *Contracts,* § 755.

The above authorities have been specifically cited, with approval, by this Court in *Nat. School Studios v. Mealey,* 211 Md. 116, 126 A. 2d 588, *Nichols v. Nicholas,* 217 Md. 79, 141 A. 2d 746, and *Gould v. Transamerican Associates,* 224 Md. 285, 167 A. 2d 905; and they correctly expound the law

of this State. In the *Mealey* case, the rule was applied to a salesman of school children's photographs, who had a known excuse for nonperformance of his contract of employment, but continued to perform for a while and then breached a term of the contract. In *Nichols v. Nicholas,* we held that the owners of certain real property had waived the time provision of an option agreement by continuing to accept payments on account of the purchase price after the expiration date of the time provision. For recent decisions of this Court dealing with the question of waiver, see *Eastover Stores, Inc. v. Minnix,* 219 Md. 658, 150 A. 2d 884 and *Hill v. Benevicz,* 224 Md. 79, 167 A. 2d 104. Compare 1 American Law of Property, § 3.95.

The early case of *Md. Fertilizing Co. v. Lorentz,* 44 Md. 218, also illustrates the principle here being discussed. That case involved an agreement to ship 12,000 carboys of oil at the rate of 2,000 carboys per month for six consecutive months. After the shipper had absolutely defaulted in one month and partially defaulted in two others, full shipments were resumed and accepted. The acceptance of the later shipments was held to constitute a waiver of the purchaser's right to terminate the contract and to deny the seller's right to continued performance.

In the instant case, there seems to be no doubt that Cushing knew of the appellant's defaults in both of the quotas for the first two quarters of the second year. Cushing stated that he "reviewed" these quotas and discussed them with Robeson. At this time, the sales obtained during the second year were of serious import to Cushing due to his guarantee to the holders of the land certificates. Cushing knew that Robeson was exerting intensive efforts to revitalize the sales force, and to bring the amount of sales back to what it had been. With full knowledge of these facts (especially his knowledge of the defaults), Cushing elected to continue to receive performance from the appellant for the last two quarters of the second year, which permitted him (since appellant's total performance for the second year was only some $14,000 or $26,000, depending upon the inclusion or exclusion of the bronze memorials and service charges, below

the figure of $700,000) to fulfill his guarantee to land certificate holders. In accordance with the principles of law stated above, when the appellee continued to accept this performance on the part of the appellant, it waived the defaults occurring because of the amount of sales during the first two quarters of the second year and relinquished its right to terminate the contract for such defaults.

The appellee earnestly argues that under the provisions of Section 9 (b) the appellant had the whole of the second year to attain the $700,000 quota, and appellee had no right to cancel the contract at the expiration of any quarterly period, or at any other time until the expiration of the year; consequently there was nothing which the appellee could have waived in that regard. With this, we are unable to agree. The specific terms of the section say that "on each of these dates [December 1, 1957, and March 1, 1958], and quarterly thereafter, during the second year * * * the quota obtained by Robeson will be reviewable by the Cemetery, with the right in the Cemetery to terminate this contract at its option if Robeson has substantially failed to attain guaranteed quota." It would render these provisions meaningless, if appellee's construction were adopted. We think the contract states and the parties intended, as we have indicated earlier in this opinion, that the quarterly quotas were reviewable during the second year with the right to terminate if Robeson "substantially failed" therein.

This brings us to the question: What, if any, damages are recoverable by the appellant? The parties agree that under the circumstances of this case the appellant was under no duty to mitigate damages. The appellant urges that his damages should be calculated on five per cent of the average of his two years' performance. The appellee asks that the case be remanded (in case of reversal) so that proof may be adduced with regard to damages; but, failing in this, it contends that the appellant's damages should be calculated on the actual sales made by the appellee during the third year.

The recovery of damages of the nature here claimed by the appellant depends upon the extent that the evidence affords a sufficient basis for estimating their amount in money

with reasonable certainty. Professor Corbin, 5 Corbin, *Contracts,* § 1025, points out that, in cases such as the instant one, proof of the sales made and business done in the agreed territory before the breach, or of the sales made by the principal or his agent after the breach, may be such as to "make possible a reasonably accurate estimate of the commissions that the agent has been prevented from earning." He concludes this section by stating: "The present rule [on the degree of certainty of the proof required to permit recovery of damages such as we are here considering] is merely one requiring that the evidence offered to prove the amount of this net gain [the gain that would have resulted from full performance, but has been prevented by defendant's breach] and that the defendant's breach has prevented its realization shall be such as to be capable of convincing a reasonable man having judicial experience." See also Restatement, *Contracts,* § 331.

In *McKeever v. Realty Corp.,* 183 Md. 216, 37 A. 2d 305, this Court permitted recovery of damages in a case similar in many respects to the case at bar. There, real estate brokers had an exclusive agency with a principal for the sale of lots. The principal wrongfully terminated the contract. The Court held that the brokers were entitled to recover as damages the profits that they would have received through full performance. It then pointed out that the amount of these damages would have to be established with reasonable certainty (citing Restatement, *Contracts,* § 331, *supra*) ; and that this can often be done, especially when, as in the instant case, the agency is an exclusive one. The opinion then went on to state that evidence as to the sales made before the breach and those made by the principal after breach may be such "as to make possible a reasonably accurate estimate of the commissions which the agent has been prevented from earning." The case was remanded for the taking of additional testimony.[4] Compare *Eastern Woodworks, Inc. v. Vance,* 206 Md. 419, 112 A. 2d 231.

---

4. For a case involving alleged loss of profits from a business that had not gone into operation, see Evergreen Amusement Corp. v. Milstead, 206 Md. 610, 112 A. 2d 901.

It is obvious in the present case that the amount of damages due the appellant cannot be set with mathematical certainty, and the law does not anticipate such precision. We think the figures agreed upon by the parties afford a basis for a reasonably accurate estimate of the commissions lost by the appellant. In the first year, gross sales after cancellations, including service charges and receipts from bronze memorials, were $758,579; and during the second year, with the same inclusions, gross sales were $685,884. In the third year, which was after appellant's services had been terminated, sales after net cancellations, including service charges and receipts from bronze memorials dropped to $564,503.50. However, this figure reflects some $64,550 in cancellations of sales made by the appellant for the appellee before the contract was terminated.

It can readily be seen that in arriving at the amount of damage in cases of this nature, no precise or general rule can or should be stated to apply in all cases, but each case must be determined on its own facts.

We think that five per cent of an average of the three years' actual performance in net sales [5] constitutes, under the facts of the instant case, a reasonably accurate estimate of the commissions which the appellant was prevented from earning by the appellee's wrongful termination of the contract. This takes into account evidence of sales before and after the breach, affords the appellant the full benefit of all sales ac-

---

5. These net sales will be computed as follows: The first year's total sales of $758,579 shall be reduced by the costs of financing and insurance, and service charges (a charge agreed upon by the parties on the sale of pre-need lots, and not subject to commission) for that year. The second year's total sales of $685,884 shall be reduced by the costs of financing and insurance, and service charges for that year. And the third year's sales of $564,503.50 (which already reflects a reduction of $69,095 for net cancellations made during the third year) shall be reduced by the costs of financing and insurance, and service charges for that year. The five per cent figure of the three years' average is probably subject to some adjustment under the provisions of paragraph 5 (a) and (b) of the contract. If these adjustments cannot be agreed upon by the parties, leave will be granted in the mandate for the chancellor to take testimony and make a finding thereon.

tually made, and, in a reasonable manner, protects the appellee from having any speculative damages awarded against it.

The decree will, therefore, have to be reversed, and the case remanded for the entry of a decree declaring the respective rights of the parties in accordance with this opinion, which decree shall include a money judgment in favor of the appellant against the appellee as indicated above.

> *Decree reversed, and case remanded for further proceedings including the entry of a decree in accordance with this opinion. The appellee to pay the costs.*